788 So.2d 917 (2001)
George PORTER, Jr., Appellant,
v.
STATE of Florida, Appellee.
No. SC88562.
Supreme Court of Florida.
May 3, 2001.
Rehearing Denied June 20, 2001.
*918 John W. Moser, Capital Collateral Regional Counsel-Middle Region, Michael P. Reiter, Chief Assistant CCRC, Amy C. Settlemire, Assistant CCRC and Linda McDermott, Staff Attorney, Office of the Capital Collateral Regional Counsel Middle Region, Tampa, FL, for Appellant.
*919 Robert A. Butterworth, Attorney General, and Kenneth S. Nunnelley, Assistant Attorney General, Daytona Beach, FL, for Appellee.
PER CURIAM.
George Porter, Jr., a prisoner under sentence of death, appeals the circuit court's denial of his motion for postconviction relief filed pursuant to Florida Rule of Criminal Procedure 3.850. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. We affirm the trial court's denial of Porter's 3.850 motion.

FACTS
Porter was convicted of two counts of first-degree murder for the 1986 shooting deaths of Evelyn Williams and her boyfriend, Walter Burrows. The facts, as fully set forth in this Court's opinion on Porter's direct appeal, are:
Porter elected to represent himself, with the assistance of standby counsel, when he went on trial in November 1987 on two counts of first-degree murder and one count each of armed burglary and aggravated assault. The facts adduced at trial are as follows.
In 1985 in Melbourne, Florida, Porter became the live-in lover of the first victim, Evelyn Williams ("Williams"). Their relationship was stormy almost from the beginning, aggravated by hostility between Porter and Williams' children, especially Williams' daughter, Amber. Several violent incidents occurred during the course of Porter's relationship with Williams. In July 1986, Porter damaged Williams' car while she was at work, and later he telephoned and threatened to kill Williams and Amber. Porter left town shortly thereafter and was not seen again in town until early October 1986. Before Porter returned to Melbourne, Williams had entered a relationship with the second victim, Walter Burrows.
When Porter returned to town, he contacted Williams' mother, Lora Mae Meyer. He told her that he wanted to see Williams, and that he had a gift for her. Meyer told Porter that her daughter did not wish to see him anymore, and that Williams wanted nothing from him. Nevertheless, Porter persisted. During each of the two days immediately preceding the murder, Porter was seen driving past Williams' house.
A few days before the murder, Porter had a conversation with a friend, Nancy Sherwood, who testified that Porter told her, "you'll read it in the paper." She offered no explanation for Porter's remark. Porter went to the home of another friend, Dennis Gardner, and asked to borrow a gun. Gardner declined, but the gun subsequently vanished from Gardner's home.
On October 8, 1986, Porter visited Williams, who then called the police because she was afraid of him. That evening, Porter went to two cocktail lounges. He spent the night with a friend, Lawrence Jury, who said that Porter was quite drunk by 11 p.m.
At 5:30 a.m. the next morning, Amber awoke to the sound of gunshots. She ran down the hallway and saw Porter standing over her mother's body. Amber testified that Porter came toward her, pointed a gun at her head and said, "boom, boom, you're going to die." Burrows then came into the room, struggled with Porter, and forced him outside. Amber telephoned for emergency assistance.
Williams' son, John, who lived next door, testified that he heard gunshot blasts at about 5:30 a.m. He ran outside and saw Burrows lying facedown in the *920 front lawn. Both Williams and Burrows were dead by the time police arrived at the scene.
On December 5, 1987, as the prosecution was nearly finished presenting its case-in-chief, Porter told the judge that he wanted to plead guilty to the murder charges and no contest to the other charges. When the judge sought the factual basis of the pleas from Porter, Porter denied killing Williams, although said he may have killed Burrows. The judge refused to accept the pleas on that basis. Porter consulted with his standby counsel and then said he would plead guilty to all four charges, but that he did not want to provide a factual basis for the pleas. The trial court conducted an extensive inquiry into the voluntariness of the pleas, and the prosecutor presented the factual basis in support of guilt. Porter admitted his guilt and said he changed his pleas "[b]ecause I want to get it over with." The trial court accepted the guilty pleas to all four counts.
Porter v. State, 564 So.2d 1060, 1061-62 (Fla.1990), cert. denied, 498 U.S. 1110, 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991).
On January 21, 1988, the trial jury returned for the penalty phase, at which Porter was represented by counsel.[1] The jury recommended death by a twelve-to-zero vote for the murder of Williams and by a vote of ten to two for the murder of Burrows, but the trial judge imposed death only on the murder of Williams. The trial judge found four aggravators[2] and no mitigators. On direct appeal, this Court struck the heinous, atrocious, or cruel (HAC) aggravator but affirmed the conviction and sentence.

PROCEDURAL HISTORY
On February 27, 1995, Porter filed the instant amended rule 3.850[3] motion, which contained fifteen issues. The trial court conducted a Huff[4] hearing on May 22, 1995. Subsequent to that hearing, the trial court issued an order on July 12, 1995, summarily denying all claims raised by Porter except for his ineffective assistance of counsel claims regarding counsel's failure to pursue mental health evaluations for the purpose of developing mitigating evidence and counsel's failure to present other matters in mitigation. On these claims the trial court conducted an evidentiary hearing on January 4 and 5, 1996. Subsequent to this hearing, the trial court denied the claims of ineffective assistance of counsel. This appeal follows.

*921 ISSUES ON APPEAL[5]
Porter raises nine issues on appeal.[6] We conclude that issues 4, 5, 7, 8, and 9, as well as part of issue 6 (relating to the "committed during the commission of a burglary" aggravator) are procedurally barred because they could have been raised on direct appeal. See LeCroy v. Dugger, 727 So.2d 236, 240 (Fla.1998) (issue 9); Ragsdale v. State, 720 So.2d 203, 205 (Fla.1998) (issue 5); Oats v. Dugger, 638 So.2d 20, 22 (Fla.1994) (issue 6); Remeta v. Dugger, 622 So.2d 452, 453-54 (Fla.1993) (issue 4); Garcia v. State 622 So.2d 1325, 1326 (Fla.1993) (issues 7 and 8). The remaining arguments in issue 6, relating to the claim of vagueness in the instructions on aggravating circumstances, are procedurally barred because Porter did not make a specific objection at trial or propose an alternative instruction and then pursue the vagueness issue on direct appeal. See Downs v. State, 740 So.2d 506, 517 (Fla.1999). We will discuss the remaining issues.

Ineffective Assistance of Counsel
As his first claim, Porter asserts his penalty phase counsel was ineffective.[7] This claim involves alleged failures in respect to investigation and presentation of evidence concerning: (1) statutory and nonstatutory mental mitigation; (2) Porter's abusive childhood environment; (3) Porter's alcohol abuse; and (4) Porter's military combat service in Korea.
The trial court held an evidentiary hearing, taking two days of testimony. At the evidentiary hearing, Porter called his penalty phase counsel, Bardwell, as his first witness. The trial judge appointed Bardwell to represent Porter because the public *922 defender had a conflict. Bardwell initially served as counsel in the guilt phase but became stand-by counsel when Porter made the decision to represent himself during the guilt phase. Bardwell thereafter became counsel for the penalty phase.
At the time of the Porter trial, Bardwell was an experienced criminal trial attorney. Bardwell had served as an assistant state attorney and then as a private criminal defense attorney who accepted conflict cases from the public defender. Prior to his representation of Porter, Bardwell had received five appointments to represent defendants in capital cases. Porter's penalty phase was the first penalty phase in which Bardwell had been involved as defense counsel.
Bardwell testified that, during the preparation for the penalty phase, Porter was very "fatalistic." Bardwell stated that Porter instructed him not to discuss the case with his wife or son. He did not want them brought into the case. Bardwell also stated that Porter refused to talk to a medical doctor, whom Bardwell wanted to evaluate Porter's alcohol use.
Following two days of evidence, the trial court entered a detailed order. In this order the trial court found that Porter had significantly limited his trial counsel in both the preparation for and presentation of the penalty phase defense. In footnote 4 of the order, the trial court stated:
This Court also finds that it is important to note here that had the Defendant cooperated with Defense Counsel's efforts to develop the statutory mitigator alleged above, this Court would not now be in the position of having to determine whether or not true statutory mitigating evidence existed at the time of trial. Indeed, the Defendant gave Defense Counsel instructions not to speak to members of his family (See Exhibit "A", Transcript at pages 77-80, 90-92) and he refused to speak to the doctor who Defense counsel sent to the jail (See Exhibit "A", Transcript at pages 55, 70-76). This total lack of cooperation with Defense Counsel, therefore, leaves this Court now in a somewhat precarious position in regards to the true existence of this statutory mitigating evidence and thus the Court finds this aspect of the Defendant's claim to be nothing more than speculation.
State v. Porter, No. 85-5546-CFA, order at 8 n. 4 (Fla. 18th Cir. Ct. order filed May 10, 1996). The lack of cooperation by Porter at the time of the trial is significant. We have held that a defense attorney is not ineffective for following such instructions by counsel's client. Sims v. State, 602 So.2d 1253, 1257 (Fla.1992). See also Sims v. Singletary, 155 F.3d 1297, 1316 (11th Cir.1998) (counsel cannot be deemed deficient for failing to present additional evidence of mitigation of which counsel was unaware due to defendant's refusal to assist in obtaining the information); Rose v. State, 617 So.2d 291, 294 (Fla.1993) (trial counsel not ineffective where defendant preempted trial counsel's strategy).
Regarding Porter's postconviction motion claims of ineffective assistance of trial counsel based upon the failure to investigate and present statutory and nonstatutory mental and other mitigation, both Porter and the State presented psychologist testimony at the postconviction evidentiary hearing. Porter presented the testimony of Dr. Henry Dee, an expert in forensic psychology and neuropsychology. Dr. Dee testified that Porter suffered from a mental condition that substantially impaired his ability to comply with the law. The State's expert, Dr. William Riebsame, an expert in forensic psychology, specifically disagreed with Dr. Dee's testimony and testified that this mitigation was not *923 present. The trial court's order held in respect to this conflicting expert testimony:
In regards to the Defendant's allegation of the presence of statutory mitigation evidence (e.g., mental health evaluations), the Defendant called, at the evidentiary hearing, Dr. Henry Dee as an expert witness in the area of forensic psychology and neuropsychology. See Exhibit "A", Transcript at pages 205-289. The testimony of Dr. Dee was tendered to establish statutory mitigating factors; i.e., that the Defendant suffered from a mental condition and that this mental condition substantially impaired his ability to comply with the law. This Court, however, finds Dr. Dee's testimony to be speculative and not supported by the evidence to a reasonable scientific certainty. This Court thus rejects Dr. Dee's testimony, and rather accepts the testimony of Dr. William Riebsame (who specifically disagreed with Dr. Dee), on this issue. See Exhibit "A", Transcript at pages 310-394. At the evidentiary hearing, Dr. Riebsame was tendered as an expert in the field of forensic psychology, and he testified that the Defendant was not suffering from a mental condition such that his ability to comply with the law was substantially impaired....
... Given, therefore, the factual findings of this Court and the Trial Court judge, as well as the [testimony of Dr. Riebsame], this Court determines that Defense Counsel was not ineffective for failing to pursue mental health evaluations and that the Defendant has thus failed to show sufficient evidence that any statutory mitigators could have been presented.
State v. Porter, No. 85-5546 CFA, order at 4-7 (Fla. 18th Cir. Ct. order filed May 10, 1996) (footnote omitted). The reason we have required postconviction evidentiary hearings on capital postconviction motions claiming ineffective assistance of counsel is to provide a defendant an opportunity to present factual and expert evidence which was not presented at the trial of the case and to have the trial court evaluate and weigh that additional evidence. Following such an evidentiary hearing, we have held that the performance and prejudice prongs are mixed questions of law and fact subject to a de novo review standard but that the trial court's factual findings are to be given deference. See Stephens v. State, 748 So.2d 1028, 1034 (Fla.1999). So long as its decisions are supported by competent, substantial evidence, this Court will not substitute its judgment for that of the trial court on questions of fact and, likewise, on the credibility of the witnesses and the weight to be given to the evidence by the trial court. Id. We recognize and honor the trial court's superior vantage point in assessing the credibility of witnesses and in making findings of fact.
At the conclusion of the postconviction evidentiary hearing in this case, the trial court had before it two conflicting expert opinions over the existence of mitigation. Based upon our case law, it was then for the trial court to resolve the conflict by the weight the trial court afforded one expert's opinion as compared to the other. The trial court did this and resolved the conflict by determining that the greatest weight was to be afforded the State's expert. We accept this finding by the trial court because it was based upon competent, substantial evidence. See id. at 1034.
Having resolved the conflict of the expert opinion, the trial court concluded that the defendant failed to demonstrate the existence of the alleged mitigation. Accordingly, the trial court held that trial *924 counsel's decision not to pursue mental evaluations did not exceed the bounds for competent counsel set forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In view of the trial court's factual finding, we agree that the trial court's conclusion that trial counsel was not ineffective is legally correct under Strickland. See Stephens v. State, 748 So.2d at 1034. We therefore affirm the trial court on this issue.
The trial court next stated its findings in respect to the other asserted nonstatutory mitigators:
Given this finding of no statutory mitigators, the question thus becomes whether the presentation of any of the nonstatutory mitigators would have made a difference in the sentencing outcome of this case. This Court finds that even if the judge and jury had been presented with the evidence of nonstatutory mitigators, this presentation would not in fact have made any difference.
In reaching this conclusion, the Court reviews the evidence presented by the Defendant, all of which may be categorized under the penumbra of one of three mitigating categories. The first of these categories of mitigating evidence is that of the Defendant's problems with alcohol. On this issue, the Court initially notes that the evidence presented is far from conclusive and in fact, the testimony of the Defendant's brother and sister conflicted on this issue. Additionally, the Court again notes the finding of the trial court judge that:
[t]he defendant was sober the night before the murders and he was sober immediately after the murders. He was able to drive and transact business. There is nothing in the record which would support a finding that this mitigating circumstance exists.
See Exhibit "B", Judgment and Sentence dated 3/4/88.
Given this finding, as well as the conflicting testimony of Defendant's siblings, this Court finds that even if the judge and jury had been presented with evidence of the Defendant's prior problems with alcohol, the effect of any such evidence on the outcome of the sentencing procedure would have been insignificant at best.
The second mitigating factor alleged by the Defendant is that of an abusive childhood. The Defendant, however, was approximately fifty-four years old at the time of trial. Due to this remoteness in time, "`evidence of a deprived and abusive childhood is entitled to little, if any mitigating weight' when compared to the aggravating factors". Bolender, 16 F.3d at 1561 (quoting Frances[Francis] v. Dugger, 908 F.2d 696, 703 (11th Cir.1990)); See also, Bottoson [v. State], 21 Fla. L. Weekly S38 [674 So.2d 621 (Fla.1996)]. Any presentation of this factor would therefore have been insignificant.
The third area of mitigating evidence is that of the Defendant's military history. Though this Court does recognize the Defendant's military service, it notes that if the Defendant had presented evidence of his military experience, the judge and jury would have been presented with evidence of the Defendant's recurring periods of being Absent Without Leave (AWOL), as well. In his testimony during the evidentiary hearing, for example, Sherman Pratt testified that the Defendant's military records reflect that the Defendant:
did have two or three periods of absence without leave ... [and] that later on when he got back to the States he went AWOL, for ... almost a year. For that he received a special court-Martial *925 and was sentenced to I think six months, fifty dollars a month fine.
See Exhibit "A", Transcript at pages 154, 155. These periods of desertion would have significantly impacted upon any mitigating effect that the evidence would have had, and indeed they would have reduced this impact to inconsequential proportions.
Not only would each of these three mitigators standing alone not have made a difference to the sentencing outcome of this case, but even if all three had been presented, their "mitigating effect [would] not begin to tip the balance of aggravating and mitigating factors in favor of [the] petitioner". Bolender, 16 F.3d at 1561. The murders here were cold, calculated, and highly premeditated; the Defendant had made clear his intent to kill Evelyn Williams, and advised her family through three separate phone calls of this intent. Indeed, as the Florida Supreme Court found in its determination that "the murder was committed in a cold, calculated, and premeditated manner without any moral or legal justification",
Porter previously had threatened to kill Williams and her daughter. He watched Williams' house for two days just before the murders. Apparently he stole a gun from a friend just to kill Williams. [Then] he told another friend that she would be reading about him in the newspaper. While Porter's motivation may have been grounded in passion, it is clear that he contemplated this murder well in advance.

Porter, 564 So.2d at 1064.
State v. Porter, No. 85-5546-CFA, order at 8-11 (Fla. 18th Cir. Ct. order filed May 10, 1996).
Giving appropriate deference to the trial court's factual findings, we agree with the trial court's conclusion that Porter has not demonstrated sufficient prejudice to sustain his burden under the prejudice component of Strickland. We conclude that the trial judge's decision is in accord with our decisions in Asay v. State, 769 So.2d 974 (Fla.2000); Rutherford v. State, 727 So.2d 216 (Fla.1998); Breedlove v. State, 692 So.2d 874 (Fla.1997); and Haliburton v. Singletary, 691 So.2d 466 (Fla.1997). Further, this case is very similar to our recent decision in Cherry v. State, 781 So.2d 1040 (Fla.2000).
In the present case, the trial court found that the defendant failed to cooperate with counsel at the penalty phase of the trial, and thereby defendant himself limited the available evidence. There is additional postconviction expert testimony regarding mitigation which the trial court found to be entitled to little weight in light of conflicting expert testimony. The trial judge found the additional nonstatutory mitigation to be lacking in weight because of the specific facts presented. Finally, following a full evidentiary hearing, the trial judge determined that the additional mitigators were outweighed by the weighty aggravators of a prior violent felony and a cold, calculated, and premeditated murder. We agree.
In view of our conclusion that the trial court was correct in respect to the failure by Porter to carry the burden on the prejudice component of Strickland, we do not reach the first component in respect to competence of counsel. See Kennedy v. State, 547 So.2d 912, 914 (Fla.1989) (performance component need not be considered when it is clear that prejudice component has not been met).
Therefore, we affirm the trial court's order in respect to this claim.

*926 Remaining Claims
We find no merit to the remainder of Porter's claims. In his second issue on appeal, Porter alleges that the trial court denied him his due process rights by not allowing him to be present at the Huff hearing to argue a claim that Porter had raised in a separately filed pro se rule 3.850 motion. As further support of the trial court's error, Porter claims that defense counsel on several occasions informed the court that Porter would be the one best prepared to argue some of the claims that were in the motion because Porter claimed they had merit. We find no merit to this issue. First, Porter was given the opportunity to raise these claims in his pro se motion and in the one filed by his attorney, and he was represented by counsel at the hearing. Moreover, the judge specifically found that no evidence on the merits of any of Porter's claims would be heard at the hearing. Finally, the trial court also provided a detailed and accurate explanation of the reasons why he denied an evidentiary hearing on the issues Porter claims he should have been present to address. Therefore, we find no error in the trial court's denial of Porter's request to appear at the Huff hearing.
Porter also claims error in the trial court's summary denial of four of his postconviction claims. After a careful review of Porter's allegations and the record in this case, we find that the record clearly refutes Porter's factual allegations on each issue. First, we find Porter's claim that the record on direct appeal was incomplete to be procedurally barred because it should have been raised on direct appeal. See Muhammad v. State, 603 So.2d 488 (Fla.1992). To the extent that this claim is based on newly discovered evidence, we find that the record clearly refutes the claim. In fact, a comparison of the record that Porter has now obtained from postconviction counsel to the record on appeal reveals that the record on appeal was more complete and comprehensive. Therefore, Porter suffered no prejudice as a result, and no evidentiary hearing was required.
Porter next claims that the trial court erred in failing to conduct an evidentiary hearing on his competence to stand trial, the adequacy of the competency hearing, and the adequacy of the evaluations conducted by the court-appointed experts. As support for these claims, Porter points to his bizarre conduct before trial and his two suicide attempts after pleading guilty. Moreover, as to the inadequate evaluation, Porter alleges that the appointed mental health experts failed to review his background materials and merely based their recommendations on interviews with Porter and observations during court proceedings. We find no merit to any of these claims.
First, the record reflects that as to his competency claims, the trial court went to great lengths to ensure Porter was competent to stand trial. Specifically, the court conducted a competency hearing before the start of trial. The record also reflects that, at the hearing, the reports of the two experts appointed to evaluate Porter were admitted into evidence, and the trial court also conducted its own extensive evaluation and thorough inquiry of Porter's rational understanding of the proceeding against him. Moreover, after Porter had pled guilty and had attempted to commit suicide, the court again ordered psychiatric examinations of Porter. After meeting with Porter in the hospital, Dr. J. Lloyd Wilder opined at the hearing to withdraw the guilty plea that Porter was thinking clearly and exercising competent judgment at the time he entered the plea. On this issue, the record reflects that the trial judge not only complied with his duty to *927 conduct a competency hearing but he undertook a conscious effort to ensure the integrity and reliability of these proceedings.
As to the adequacy of the court-appointed experts, the record reflects that Porter was evaluated by two reputable doctors on several occasions. Each time, the doctors opined that Porter was competent to stand trial. Although Porter alleges that he was evaluated by a different mental health expert who, after examining him and reviewing his background, concluded that he was not competent to enter a guilty plea, Porter does not provide the expert's name or when any of these evaluations occurred. Moreover, we have held that merely because a defendant presents a new expert who has evaluated a defendant after trial and who renders a different opinion than prior experts that does not by itself render inadequate a prior thorough evaluation. See, e.g., Engle v. Dugger, 576 So.2d 696 (Fla.1991).
As his next subclaim, Porter alleges that the trial court erred in summarily denying his claim that the court conducted an inadequate Faretta[8] inquiry to determine whether Porter's waiver of counsel was voluntary, knowing, and intelligent. He further claims that the trial court applied the wrong standard for determining a defendant's competency to waive counsel. We disagree with both of his claims. In United States v. Fant, 890 F.2d 408 (11th Cir.1989), the court outlined the following factors to be considered in determining whether a defendant made a knowing and voluntary waiver:
(1) the background, experience and conduct of the defendant including his age, educational background, and his physical and mental health; (2) the extent to which the defendant had contact with lawyers prior to trial; (3) the defendant's knowledge of the nature of the charges, the possible defenses, and the possible penalty; (4) the defendant's understanding of the rules of procedure, evidence and courtroom decorum; (5) the defendant's experience in criminal trials; (6) whether standby counsel was appointed, and the extent to which he aided the defendant; (7) whether the waiver of counsel was the result of mistreatment or coercion; or (8) whether the defendant was trying to manipulate the events of the trial.
Id. at 409-10 (quoting Strozier v. Newsome, 871 F.2d 995, 998 (11th Cir.1989)). The transcripts in the instant case reflect that the trial judge conducted several extensive inquiries of defendant which covered all of the areas outlined in Fant. He inquired as to Porter's knowledge and familiarity with the legal system and also discussed Porter's mental conditions and the dangers and disadvantages associated with Porter representing himself. Therefore, the record clearly refutes Porter's claim on this issue, and, therefore, no evidentiary hearing was required.[9] Porter's claim as to the standard for determining competency is without merit. See Godinez v. Moran, 509 U.S. 389, 399, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993).
Porter's final claim on this issue is that the trial court erred in summarily denying his Brady[10] claim. As correctly *928 found by the trial court, most of Porter's allegations on this issue constituted mere challenges to the sufficiency of the evidence; therefore, they are not Brady claims. As to his remaining allegations, the record reflects that both Porter and the State stipulated to the introduction into evidence of the articles and objects claimed by Porter to have been withheld by the State. For these reasons, we find that Porter's claims are clearly refuted by the record, and no evidentiary hearing was needed.

CONCLUSION
Because Porter has failed to demonstrate any basis for relief, we affirm the trial court's denial of Porter's rule 3.850 motion.
It is so ordered.
WELLS, C.J., and SHAW, HARDING, LEWIS, and QUINCE, JJ., concur.
ANSTEAD, J., concurs in part and dissents in part with an opinion, in which PARIENTE, J., concurs.
ANSTEAD, J., concurring in part and dissenting in part.
The most troubling issue on appeal is appellant's claim that defense counsel provided virtually no representation for him at the penalty phase of the trial. Pointing to the complete lack of adversarial testing by counsel's failure to challenge the State's case or present mitigating evidence, Porter asserts that he was essentially deprived of the benefit of counsel, and counsel's default undermines confidence in the outcome of the penalty phase proceeding. Because the record clearly supports Porter's contention, and this Court has consistently ordered new penalty proceedings in similar cases, I dissent from the majority opinion upholding the trial court's denial of relief on this issue. See Rose v. State, 675 So.2d 567, 573-74 (Fla.1996); Hildwin v. Dugger, 654 So.2d 107, 110 (Fla.1995).
Porter claims that because of counsel's failure to investigate and present evidence of important and substantial statutory and nonstatutory mitigation, or to challenge the State's claims of aggravation, the jury and the trial court, and this Court as well, approved a sentence of death predicated upon the erroneous assumption that there were no mitigating circumstances. He notes that even without the substantial mitigation now established, two judges of this Court voted to reduce his sentence to life.[11] He also asserts that the substantial mitigation now shown to exist becomes even more important in view of the original sentencing judge's finding that much of the State's case for aggravation was "technical" in nature, and this Court's conclusion on appeal that the most serious aggravator, the heinous, atrocious or cruel (HAC) aggravator, was improperly considered.

*929 LIMITED COURT ORDER
The majority opinion simply ignores the fact that the trial court expressly declined to rule on whether counsel's conduct was deficient: "The Court declines to make a determination on the deficiency portion of this requirement, however, because no prejudice was shown." The trial court ruled only that no prejudice to Porter was demonstrated under the prejudice prong of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Hence, contrary to the majority's analysis, we have no ruling by the trial court on counsel's deficient performance to review.[12]

LAW
In order to prove an ineffective assistance of counsel claim, a defendant must establish two elements:
First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.
Strickland, 466 U.S. at 687, 104 S.Ct. 2052; see also Rutherford v. State, 727 So.2d 216 (Fla.1998); Rose, 675 So.2d at 571; Hildwin 654 So.2d at 109. In Maxwell v. Wainwright, 490 So.2d 927 (Fla.1986), this Court further explained the application of the Strickland standard:
A claim of ineffective assistance of counsel, to be considered meritorious, must include two general components. First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined.

Id. at 932 (citing Strickland) (emphasis added); see also Downs v. State, 453 So.2d 1102 (Fla.1984). Claims of ineffective assistance of counsel present a mixed question of law and fact subject to plenary review based on the Strickland test. See Stephens v. State, 748 So.2d 1028, 1032 (Fla.1999) (citing Rose, 675 So.2d at 571). This requires an independent review of the trial court's legal conclusions, while giving deference to the trial court's factual findings. See id.

TRIAL COURT'S ANALYSIS
In concluding that no prejudice had been demonstrated the trial court stated:
(H) The Court thus summarizes the holdings of this Order as follows: In order to deem Defense Counsel ineffective, this Court must determine that Defense Counsel's performance was deficient, and that this deficiency prejudiced the Defendant. The Court declines to make a determination on the deficiency portion of this requirement, however, because no prejudice was shown. In making this determination of no prejudice, the Court rejects the testimony of Dr. Dee, accepts the testimony of Dr. Riebsame, and finds that no statutory mitigators could have been presented. In regards to nonstatutory mitigators, *930 the Defendant presented evidence of problems with alcohol, childhood abuse, and participation in the military. Even if, however, the Defendant had presented such evidence at the penalty phase proceedings, the effect thereof would have been insignificant and indeed would have had no effect upon the sentencing outcome in this case. The circumstances of the crimes were brutal, the murders were "cold-blooded" and "premeditated", and this Court is quite convinced that none of the evidence it has reviewed would have altered the outcome of the sentencing proceedings.
In rejecting any showing of prejudice, the trial court summarily concluded that "no statutory mitigators could have been presented." The nonstatutory mitigation was similarly rejected. This evaluation clearly constitutes an error of law and ignores the obligation of the judge and jury to consider mitigation, and especially the important role of the jury in the determination of life or death.
Although in the context of a Brady claim, the United States Supreme Court considered a similar flawed analysis in the case of Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995):
Justice Scalia [dissenting] suggests that we should "gauge" Burns's credibility by observing that the state judge presiding over Kyles's postconviction proceeding did not find Burns's testimony in that proceeding to be convincing, and by noting that Burns has since been convicted for killing Beanie. Of course, neither observation could possibly have affected the jury's appraisal of Burns's credibility at the time of Kyles's trials.
Kyles, 514 U.S. at 450 n. 19, 115 S.Ct. 1555 (emphasis supplied). The circuit court analysis here failed to focus on the jury's role, much as the Supreme Court noted the trial court failed to do in Kyles. Like the trial court in Kyles, the circuit court here patently failed to evaluate the evidence from the point of view of its possible effect on the jury and whether the death recommendation rendered without this important mitigating evidence being presented "result[ed] in a verdict worthy of confidence." Kyles, 514 U.S. at 434, 115 S.Ct. 1555.
In addition, of course, it would seem apparent that a defendant on trial for his life would be prejudiced by his counsel's failure to make a case for his life to be spared, when there was a case to be made. After reviewing the trial court's method of analysis against the prescribed statutory scheme for considering aggravation and mitigation, and its conclusions against the record in this case, it is apparent that the trial court here could provide no lawful basis to support the conclusion that the defendant was not prejudiced by his counsel's neglect or that a sentencing jury would completely reject the substantial mitigation offered here.

PREJUDICE
While the postconviction court may consider the credibility of the witnesses presented, the court's analysis must focus on the legal competence of the proffered evidence of mitigation and the potential effect the mitigation may have had on the jury. In turn, this analysis will result in a determination of whether the failure to actually present such mitigation evidence at the penalty phase undermines confidence in an outcome not informed by the presentation of such evidence as required under the prejudice prong of Strickland.
A simple illustration of this concept may be understood by positing a situation where counsel presented no mitigation, but it turns out there was no mitigation to present. A defendant could hardly be deemed to have been prejudiced by the *931 failure to present what never existed. But Porter has demonstrated a scenario that is the exact opposite of this hypothetical. He presents a scenario where there was an abundance of mitigation but none was presented by counsel. Surely, nothing could be more prejudicial to a defendant whose only hope for life rests on his counsel's challenge of the State's case for aggravation and the affirmative presentation of mitigation in favor of the defendant to the jury.

STATUTORY SENTENCING SCHEME
An analysis of a claim of prejudice by the ineffectiveness of counsel at the penalty phase must take into account the fact that the penalty phase of a capital trial is based upon and controlled by a statutory scheme that instructs a jury and judge to consider both evidence of aggravation and mitigation, and to come to a proper conclusion based upon a reasoned comparative analysis of the aggravation and mitigation as properly assessed and weighed. See § 921.141, Fla.Stat. (1999). Indeed, the instructions given to the jury mandate that the jurors utilize this framework in deciding upon a recommendation. The trial judge, too, is guided by this framework in conducting a reasoned analysis of aggravation and mitigation in order to determine the appropriate sentence of life or death. Obviously, the complete absence of evidence of either aggravation or mitigation would have a marked effect on this analysis.
For instance, in this case, the postconviction judge was required by the legislative sentencing scheme discussed above to balance the extensive evidence of statutory mental mitigation and important nonstatutory mitigation now shown to have been available for presentation to the jury against the prior analysis of aggravating factors relied upon by the sentencing court at the prior trial, but excluding the heinous, atrocious or cruel (HAC) aggravator struck on direct appeal, in order to determine whether prejudice existed. The postconviction judge's order simply does not reflect such an analysis.

DUTY OF COUNSEL
Consistent with Florida's statutory framework for aggravation and mitigation, this Court has held that an attorney has a fundamental obligation to conduct a reasonable investigation of a defendant's background for possible mitigating evidence before counsel can make informed choices as to how to advocate for a defendant at a penalty-phase proceeding. See Rose, 675 So.2d at 571 (citing Porter v. Singletary, 14 F.3d 554, 557 (11th Cir. 1994)). In other words, defense counsel must be prepared and knowledgeable about the law and the facts of his client's case concerning both aggravation and mitigation in order to make informed strategic choices and to provide the adversarial testing required under our adversary system of justice and the dictates of Strickland. The United States Supreme Court has declared:
The paramount importance of vigorous representation follows from the nature of our adversarial system of justice. This system is premised on the welltested principle that truthas well as fairnessis "`best discovered by powerful statements on both sides of the question.'" Absent representation, however, it is unlikely that a criminal defendant will be able adequately to test the government's case, for, as Justice Sutherland wrote in Powell v. Alabama, 287 U.S. 45[69, 53 S.Ct. 55, 77 L.Ed. 158] (1932), "[e]ven the intelligent and educated layman has small and sometimes no skill in the science of law."
*932 Penson v. Ohio, 488 U.S. 75, 84, 109 S.Ct. 346, 102 L.Ed.2d 300 (1988) (citation omitted). As the Supreme Court has explained, under our procedural and adversarial system of justice, confidence in the outcome is essentially based upon the quality of the process. And the process breaks down when counsel fails to fulfill his adversarial role.
In short, it is obviously difficult, if not impossible, to have confidence in a sentence that was imposed based upon a one-sided presentation, i.e., unchallenged aggravation and no mitigation, when it is later demonstrated that substantial mitigation exists and one of the most serious aggravators was improperly considered and stricken on appeal. To approve of counsel's default, as we have done here, is tantamount to holding that the defendant was not entitled to the benefit of counsel at his penalty phase proceeding.

AGGRAVATION AND MITIGATION
Even a cursory review of the evidence presented below establishes both substantial neglect by counsel and substantial prejudice. Counsel failed to challenge the State's case for aggravation in any way. Despite this, the trial court, on its own initiative, rejected the jury's recommendation for death as to the death of one victim, and held that two of the State's proposed aggravators, while established, were "technical" in nature and entitled to little weight. See Porter v. State, 564 So.2d 1060 (Fla.1990). In addition, despite trial counsel's failure to challenge the most important aggravator claimed by the State and found by the trial court, this Court, on appeal, struck the heinous, atrocious and cruel (HAC) aggravator for lack of a sufficient factual predicate:
Moreover, this record is consistent with the hypothesis that Porter's was a crime of passion, not a crime that was meant to be deliberately and extraordinarily painful. The state has not met its burden of proving this factor beyond a reasonable doubt, and the trial court erred in finding to the contrary.
Porter, 564 So.2d at 1063. Hence, it is apparent that there were substantial weaknesses in the State's case for aggravation that defense counsel wholly failed to address. For example, defense counsel failed to challenge a jury instruction on the cold, calculated, and premeditated aggravator that was later found to be unconstitutional.
The failure to address mitigation is even more glaring. At the postconviction evidentiary hearing, Dr. Henry Dee, an expert in forensic psychology and neuropsychology, testified that Porter suffers from brain damage and post-traumatic stress disorder. Dr. Dee's conclusions were based on the results of extensive testing he personally conducted on Porter as well as substantial background materials accumulated concerning Porter's personal history.[13] He further testified that because of these conditions, Porter suffered from extreme mental or emotional disturbance at the time of the crime and his ability to conform his conduct to the requirements of the law at that time was substantially impaired. These are two important statutory mitigating factors expressly set out in Florida's death penalty statutory scheme that the defendant was entitled to have *933 presented to the jury.[14] During the evidentiary hearing conducted in the trial court, evidence established that at the penalty phase counsel for Porter did not investigate or present any evidence of mental mitigation or request the assistance of a mental health expert for mitigation purposes, even though Porter twice attempted suicide and broke his leg in the attempt while these proceedings were pending, and it was apparent that he had serious and substantial mental problems that should be evaluated for mitigation.[15]
In addition to the extensive evidence of statutory mental mitigation, Porter presented evidence at the postconviction evidentiary hearing of his alcohol abuse, his positive military history, and his troubled childhood riddled with abuse, all of which has been recognized as valid nonstatutory mitigation.[16] On the issue of his alcohol abuse, Porter presented his sister, Eileen Wireman, and his brother James Porter, who both testified that Porter had a serious and longstanding alcohol problem. Although his brother was able to provide more detailed testimony because he was closer to Porter than his sister, they both testified that he drank often and in great quantity after he returned from the Korean War. Further, even though the original sentencing judge found no mitigating circumstances, Justice Barkett noted the important role alcohol played in this case:
Furthermore, the record discloses that Porter had been drinking heavily, to the point of drunkenness, in the late night hours prior to the murder. Shortly after the murder he purchased more liquor and beer. This evidence, combined with evidence of Porter's emotionally charged, desperate, frustrated desire to meet with his former lover, is sufficient to render the death penalty disproportional punishment in this instance, although it certainly does not excuse the killing.
Porter v. State, 564 So.2d at 1065-66 (Barkett, J., dissenting).
Lieutenant Colonel Sherman Pratt testified in great detail at the postconviction evidentiary hearing that Porter provided heroic service during the Korean War and, more importantly for purposes of mitigation, he testified that Porter clearly suffered both physically and mentally, and that his company suffered the heaviest casualties in battle. Porter joined the Army at age sixteen. Porter's service in the war earned him several combat medals, including: three Bronze Stars; the Combat Infantry Badge; and a Purple Heart (with first cluster). Moreover, he was favorably considered for the Good Conduct Medal, was entitled to award of the Korean Presidential Unit Citation, and was subsequently honorably discharged.
Finally, extensive evidence of Porter's troubled and abusive childhood was presented which included Porter witnessing his drunk father's extensive abuse of his mother, as well as receiving his own severe beatings from his father.

Mental Mitigation
In essence, the trial court did its own subjective sentencing analysis when it summarily concluded: "[T]his Court is *934 quite convinced that none of the evidence it has reviewed would have altered the outcome of the sentencing proceedings." However, Strickland requires an objective analysis of the omitted evidence and its potential effect. In fact, neither the trial court nor the State has demonstrated a legal reason why a jury could not consider the testimony of the two experts and reach a conclusion contrary to that of the trial judge.[17]
While the credibility of the attesting witnesses will be a factor for both a jury and judge in determining the appropriate weight to be given to the mitigating evidence, the testimony of Dr. Dee, an unchallenged expert in forensic psychology and neuropsychology, supporting the presence of two statutory mitigators, would certainly have to at least be considered by a jury and judge, even when provided with the contrary views of Dr. Riebsame. Further, while the trial court concludes that none of the above proffered evidence of mental mitigation could have been presented to a sentencing jury, he provides absolutely no credible basis or rationale for such a conclusion. Consider, for example, our reaction on appeal if a trial court prevented a defendant from presenting such important evidence to a penalty-phase jury.
The prejudicial effect of the failure to present this important mitigation is even more apparent. On the issue of prejudice in this context, we have specifically explained:
In evaluating the harmfulness of ... counsel's performance, we have consistently recognized that severe mental disturbance is a mitigating factor of the most weighty order, Hildwin, 654 So.2d at 110; Santos v. State, 629 So.2d 838, 840 (Fla.1994), and the failure to present it in the penalty phase may constitute prejudicial ineffectiveness. Hildwin, 654 So.2d at 110.
Rose, 675 So.2d at 573; see also Baxter v. Thomas, 45 F.3d 1501, 1512-13 (11th Cir. 1995) (stating that "[p]sychiatric mitigating evidence `has the potential to totally change the evidentiary picture.'"). A review of our case law reflects that the mental mitigation presented by the expert in this case is just as weighty as the mental mitigation we have relied on in the past to require new sentencing proceedings of defendants. See, e.g., Rose, 675 So.2d at 571 (finding counsel ineffective and ordering a new sentencing proceeding where counsel failed to discover and present expert testimony that defendant suffered from brain damage, his ability to appreciate the criminality of his conduct was impaired, and that he was under the influence of extreme or emotional disturbance at the time of the crime); Hildwin, 654 So.2d at 110 (finding that defendant was prejudiced by counsel's failure to discover and present expert testimony that defendant murdered while under the influence of extreme mental or emotional disturbance and that defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired).
In addition, of course, prejudice in the failure to present two important statutory mitigators must be considered in the context *935 of a record that demonstrates a trial court finding that two of the State's aggravators were "technical," a Supreme Court finding that the most substantial aggravator (HAC) was improperly found, and the strong opinions of two justices that a death sentence was not warranted even without any mitigation. Obviously, the failure to present these important mitigators would seriously affect the balancing of the remaining aggravation versus mitigation.

Nonstatutory Mitigation
Further, this Court has consistently recognized the kind of evidence presented by Porter as valid nonstatutory mitigation. See Elledge v. State, 613 So.2d 434, 436 (Fla.1993); Campbell v. State, 571 So.2d 415, 419 (Fla.1990); Masterson v. State, 516 So.2d 256, 258 (Fla.1987). In fact, all of the nonstatutory mitigation described in this case has been recognized as supporting ineffective assistance of counsel claims in the past or to have served as the proper basis to reduce a death sentence to life. See, e.g., Masterson, 516 So.2d at 258 (finding that defendant's service in Vietnam, along with other mitigators, was sufficient for a jury to recommend a life sentence); Nibert v. State, 574 So.2d 1059 (Fla.1990) (reducing sentence to life where mitigating evidence showed among other things that defendant had suffered from child abuse and alcohol abuse and had been drinking heavily on the day of the murder).
First, with regard to Porter's alcohol abuse, Justice Barkett emphasized in her separate opinion on direct appeal: "[T]he record discloses that Porter had been drinking heavily, to the point of drunkenness, in the late night hours prior to the murder. Shortly after the murder he purchased more liquor and beer." Porter, 564 So.2d at 1065 (Barkett, J. dissenting). Neither the State nor the trial court has cited any evidence to contradict these observations; hence, Porter's long-standing problems with alcohol and his drinking on the night of the murder essentially stand unrefuted. Further, even if the court below was arguably correct in discounting evidence of Porter's intoxication on the night of the murders, the court has failed to refute or provide any reasons for discounting the mitigating effect of Porter's established alcoholic past.
The trial court discounted Porter's alcohol abuse, finding that because the original sentencing court had concluded that Porter was sober the night before the murder and immediately thereafter, this mitigation would have been insignificant. On the issue of Porter's troubled childhood, the trial court also found the evidence presented insignificant since Porter was fifty-four years old at the time of the crime. Finally, the trial court dismissed Porter's evidence of his military history on the basis that Colonel Pratt's testimony noted that Porter had been AWOL on several occasions, and this would "have reduced this impact [impact of mitigation on the jury] to inconsequential proportions."
The trial court's analysis on the issue of Porter's abusive childhood also is flawed. In Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), the United States Supreme Court stated: "Evidence of a difficult family history and of emotional disturbance is typically introduced by defendants in mitigation." Id. at 115, 102 S.Ct. 869. While "[t]he sentencer, and the Court of Criminal Appeals on review, may determine the weight to be given relevant mitigating evidence ... they may not give it no weight by excluding such evidence from their consideration." Id. at 114-15, 102 S.Ct. 869. In addition, this Court has repeatedly held that the effect of this mitigator is not nullified simply because many years have passed between the time of the abuse and the effect of that abuse. See Nibert. In Nibert, we specifically held:

*936 The fact that a defendant had suffered through more than a decade of psychological and physical abuse during the defendant's formative childhood and adolescent years is in no way diminished by the fact that the abuse finally came to an end. To accept that analysis would mean that a defendant's history as a victim of child abuse would never be accepted as a mitigating circumstance, despite well-settled law to the contrary.
574 So.2d at 1062. On this issue, the trial court did exactly what we have cautioned trial courts against doing. Instead of evaluating the evidence presented in support of this mitigator, the trial court simply dismissed it because of the time elapsed between when the abuse occurred and the time of the crime in this case.
Finally, it is apparent that the trial court substituted its opinion for that of a jury with its conclusion that the impact of Porter's military history would have been of "inconsequential proportions." As noted by the trial court, Porter was AWOL and was disciplined accordingly. Notwithstanding, his temporary status as AWOL was apparently not serious enough to nullify his time and service in the military, since he was decorated numerous times and honorably discharged. In fact, the same military witness who testified about his AWOL status also testified that Porter was considered for several awards for his years and performance in the service. Moreover, there is unrefuted testimony that Porter's company suffered extensive casualties in the Korean War and that Porter himself suffered extreme physical and mental pain. Therefore, although his AWOL status may have reduced the effect of this mitigator, the jury still could have considered it in mitigation and attributed it some weight. See, e.g., Burns v. State, 699 So.2d 646, 648 (Fla.1997) (finding defendant's honorable discharge as a mitigator even though his discharge was for extreme demerits).

CLASSIC CASE OF INEFFECTIVENESS
After evaluating the statutory and nonstatutory mitigation presented at the evidentiary hearing, it is obvious that this case presents a classic scenario identical to other cases in which we have overturned trial court decisions denying claims of ineffectiveness when a death sentence has been imposed in the face of uninvestigated and undisclosed evidence of mitigation. See Rose, 675 So.2d at 572 (finding defense counsel ineffective at the penalty phase for failing to present evidence of severe mental disturbance and for failing to present evidence of defendant's alcoholism and mistreatment as a child); Hildwin, 654 So.2d at 110 (finding ineffective assistance where counsel failed to present evidence of defendant's mental mitigation and several categories of nonstatutory mitigation including defendant's abuse and neglect as a child and his history of alcohol abuse); Phillips v. State, 608 So.2d 778, 783 (Fla. 1992) (finding ineffective assistance of penalty-phase counsel where although counsel presented some evidence in mitigation, he did not present a large amount of evidence concerning defendant's childhood riddled with abuse and testimony of experts describing defendant's mental and emotional deficiencies); Stevens v. State, 552 So.2d 1082, 1087 (Fla.1989) (holding that defense counsel's failure to investigate defendant's background, failure to present mitigating evidence during the penalty phase, and failure to argue on defendant's behalf rendered his conduct at the penalty phase ineffective). Consistency mandates that we apply those holdings here.

CONCLUSION
This Court has repeatedly stressed the importance of presenting mitigating evidence *937 in the penalty phase of a capital trial in light of the statutory sentencing scheme that depends entirely on a jury and judge's evaluation of aggravation and mitigation in deciding on life or death. As noted above, the Legislature has carefully and specifically crafted a framework and set of guidelines in the form of aggravators and mitigators to guide the judge and jury in considering whether life or death is the appropriate sentence. In fact, this specially created scheme is warranted precisely because of the nature and gravity of the punishment choices.[18] Counsel's actual presentation on behalf of Porter at the penalty phase bears virtually no relationship to this framework, and, accordingly, we must conclude that Porter was denied the right to have the jury and trial court judge review and weigh the circumstances of his case under these legislatively established guidelines and framework.
The present record reflects that there exists too much mitigating evidence that was not presented to now be ignored. This failure to investigate and present mitigation is especially harmful in light of the fact that this Court was confronted with a trial court finding of no mitigation when we approved the death sentence on Porter, and in light of the divided vote of the justices of this Court on proportionality even without the substantial mitigation that we now know existed. In addition, the harm must be considered in light of the reversal of the HAC finding in this case.
In sum, it is apparent that the trial court erred as a matter of law in concluding that a jury could not have considered the substantial mitigation that has now been demonstrated to have existed, but that was never discovered or presented by counsel, and in concluding that such evidence would have no effect on the jury. Surely, our Legislature's capital sentencing scheme never contemplated that a case would be found to be "the most aggravated and least mitigated" because of the complete default of a defendant's lawyer.
PARIENTE, J., concurs.
NOTES
[1] Porter's penalty phase counsel was his standby counsel in the guilty phase.
[2] The four aggravators found by the trial judge were: (1) the defendant had been previously convicted of another capital felony or a felony involving the use or threat of violence to the person; (2) the capital felonies were committed while the defendant was engaged in the commission of a burglary; (3) the murder was especially heinous, atrocious, or cruel; and (4) the murder was committed in a cold, calculated, and premeditated manner.
[3] Porter's initial 3.850 motion was filed on June 22, 1992. That motion contained a public records request under chapter 119, Florida Statutes. Porter was given sixty days from the date of full disclosure of all public records to amend his motion. On June 28, 1993, Porter filed an amended motion to vacate the convictions and sentences. The trial court denied the motion because it failed to contain a properly sworn oath. After Porter's motion for reconsideration was denied, he sought review of the order with this Court. On November 29, 1994, we granted the State's motion to dismiss without prejudice to Porter filing a properly sworn motion within ninety days of that order. This was the motion that was ultimately denied by the trial court.
[4] Huff v. State, 622 So.2d 982 (Fla.1993).
[5] In a recent case dealing with the failure of an attorney to file an appeal on behalf of a defendant pursuant to the denial of a noncapital rule 3.850 motion, we held that the defendant was entitled to petition the court for a writ of habeas corpus on whether the attorney had indeed agreed to file an appeal. See Steele v. Kehoe, 747 So.2d 931, 934 (Fla. 1999). We further instructed that if the defendant prevailed, he would have the right to file a belated rule 3.850 motion. See id. This court has always recognized a defendant's right to appeal from the denial of a motion for postconviction relief. Although Porter's counsel was five days late in filing his notice of appeal, we find that counsel's tardiness of five days should not constitute a waiver of Porter's right to have his initial postconviction capital motion reviewed. The State does not challenge Porter's wish to appeal. However, we caution counsel that such lateness in future cases may result in sanctions imposed against counsel.
[6] Porter's nine claims are: (1) Porter received ineffective assistance of penalty phase counsel; (2) Porter's due process rights were violated when he was not permitted to appear at the Huff hearing; (3) the trial court failed to grant an evidentiary hearing on Porter's claims that the record on appeal was incomplete; he was incompetent to stand trial; the competency hearing and psychiatric evaluations were inadequate; the Faretta inquiry was inadequate; and the State withheld exculpatory information in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); (4) the trial court impermissibly relied on nonstatutory aggravators; (5) the penalty phase jury instructions impermissibly shifted the burden of proof to Porter; (6) the aggravating circumstance instructions were overbroad and vague; (7) the death sentence is impermissibly based on an unconstitutional automatic aggravating circumstance; (8) the trial court failed to consider mitigating evidence; and (9) the prosecutor engaged in improper prosecutorial conduct during trial.
[7] See Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), wherein the Court held:

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient.... Second, the defendant must show that the deficient performance prejudiced the defense.
[8] Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).
[9] In fact, although not in effect at the time of the trial in this case, the judge's inquiry of Porter on this issue comports with the model colloquy that is now available for trial judges when conducting a Faretta inquiry. See Amendment to Fla. Rule of Crim. Pro. 3.111(d)(2)-(3), 719 So.2d 873, 876-80 (Fla. 1998).
[10] Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
[11] Justice Barkett dissented in an opinion concurred in by Justice Kogan and explained:

I agree that Porter's conviction should be affirmed. I believe, however, that a proportionality review mandates reversal of the penalty. I am not persuaded that the aggravating factor of cold, calculated, and premeditated has been established beyond every reasonable doubt. I do not suggest that there is an "unrequited love" exception to the death penalty. Nonetheless, this Court consistently has accepted as substantial mitigation the inflamed passions and intense emotions of such situations. In almost every other case where a death sentence arose from a lovers' quarrel or domestic dispute, this Court has found cause to reverse the death sentence, regardless of the number of aggravating circumstances found, the brutality involved, the level of premeditation, or the jury recommendation.
Porter v. State, 564 So.2d 1060, 1065 (Fla. 1990) (Barkett, J., dissenting).
[12] At one point in the majority opinion the majority appears to approve a trial court finding of no ineffectiveness (majority opinion at 923); while at another point the opinion acknowledges that the trial court only ruled on the prejudice prong (majority opinion at 925).
[13] The State attempted to rebut this testimony with that of Dr. Riebsame, who testified that he did not believe Porter was suffering from any brain damage or post-traumatic disorder. However, Dr. Riebsame's testimony was based solely on his reading of available materials rather than any direct interview or testing of Porter. In fact, Dr. Riebsame never met or evaluated Porter. Of course, a jury would be entitled to hear and evaluate Dr. Riebsame's testimony, just as it would have to evaluate Dr. Dee's evidence.
[14] See § 921.141(6)(b)(f), Fla.Stat. (1999).
[15] When Porter returned to his jail cell on the night he entered his guilty pleas, he attempted to commit suicide by twice hurling himself to the concrete floor from a fourteen-foot catwalk. Porter broke his leg but suffered no other serious injuries.
[16] In addition, although counsel failed to assert this as mitigation at the penalty phase, there is no indication in the record that Porter had any prior record of violent criminal activity.
[17] In addition, although we ordinarily give deference to the trial court's factual findings, after reviewing both of the experts' testimonies, we would be hard-pressed to approve the trial court's finding that the State's expert on mental mitigation was more credible, when the record reflects no factual basis for this conclusion, the State's expert neither personally met nor interviewed Porter before rendering his opinion, and the trial court cites no other basis for this factual conclusion. If anything, an objective evaluation would ordinarily render the examining expert's opinion more credible.
[18] We have repeatedly stated:

Death is a unique punishment in its finality and in its total rejection of the possibility of rehabilitation. It is proper, therefore, that the Legislature has chosen to reserve its application to only the most aggravated and unmitigated of most serious crimes.... The Legislature has.. provided a system where by the possible aggravating and mitigating circumstances are defined, but where the weighing process is left to the carefully scrutinized judgment of jurors and judges.
State v. Dixon, 283 So.2d 1, 7 (Fla.1973) (emphasis added).