944 So.2d 234 (2006)
Daniel BURNS, Appellant,
v.
STATE of Florida, Appellee.
No. SC01-166.
Supreme Court of Florida.
November 2, 2006.
*236 John William Jennings, Capital Collateral Regional CounselMiddle Region, Eric Pinkard and David Robert Gemmer, Assistant CCR Counsel, Tampa, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, Florida and Carol M. Dittmar, Senior Assistant Attorney General, Tampa, FL, for Appellee.
PER CURIAM.
Daniel Burns appeals an order of the circuit court denying a motion for postconviction relief under Florida Rule of Criminal Procedure 3.850 and an order concluding that he is not mentally retarded. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. As explained below, we affirm the circuit court's denial of Burns' postconviction motion and the order on mental retardation.

*237 I. FACTS AND PROCEDURAL HISTORY
Burns was convicted of first-degree murder and cocaine trafficking, and the judge imposed the death sentence following a unanimous jury recommendation of death. The underlying facts were set out by this Court:
[On August 18, 1987, a] police officer stopped Burns and his companion Samuel Williams as the two were traveling north on Interstate 75. The officer asked the two men for identification and then returned to his vehicle to use the radio. A highway patrol dispatcher confirmed that the officer requested a "persons' check" and a registration check on the tag of the vehicle in which Burns and Williams were traveling. The officer then walked back to Burns and Williams and asked if he could search their vehicle. While searching the trunk, he discovered what appeared to be cocaine. A struggle between the officer and Burns ensued. Williams and several bystanders witnessed the struggle. Burns obtained the officer's gun, and the officer warned the bystanders to stay away. Despite the officer's pleas, Burns shot and killed the officer. Burns told Williams to leave the vehicle, and then Burns fled the scene on foot.
Burns was convicted of first-degree murder and trafficking in cocaine. The jury recommended death, and the trial judge followed the recommendation. On appeal, this Court affirmed Burns' convictions but vacated his death sentence. Burns v. State, 609 So.2d 600 (Fla.1992) (Burns I).
Burns v. State, 699 So.2d 646, 647-48 (Fla. 1997) (Burns II). In Burns v. State, 609 So.2d 600 (Fla.1992) (Burns I), we vacated the death sentence and remanded for a new penalty phase because we could not determine what weight the trial judge gave to the various aggravating and mitigating factors that he found or what part an aggravator found to be invalid played in Burns' sentence. We determined that the error in Burns' case could not be found to be harmless and that because of another evidentiary error in the penalty phase proceeding, a new penalty phase before a jury was required. Burns I, 609 So.2d at 607.
At resentencing the jury again unanimously recommended death, and the trial judge followed that recommendation. The trial judge found three aggravating factors which were merged into one,[1] two statutory mitigating factors,[2] and three nonstatutory mitigating factors.[3] This Court affirmed *238 the death sentence. Burns II, 699 So.2d at 654.
On March 2, 2000, Burns filed an amended motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850, raising seven claims.[4] The postconviction court held a Huff[5] hearing, and the parties agreed that only the first claim, concerning ineffective assistance of resentencing counsel, required an evidentiary hearing.
The evidentiary hearing was held on November 20, 2000. Burns presented the testimony of his resentencing attorneys, Assistant Public Defender Adam Tebrugge and Public Defender Elliot Metcalfe, and the testimony of forensic psychologist Dr. Robert Berland and clinical neuropsychologist Dr. Henry Dee. The State did not present any witnesses at the evidentiary hearing but requested that the postconviction court take judicial notice of the prior record and the testimony presented both at Burns' initial trial and resentencing. The State specifically requested that the postconviction court examine the testimony of clinical neuropsychologist Dr. Sidney Merin, who testified at the penalty phase of Burns' initial trial.
The postconviction court subsequently denied all of Burns' claims. State v. Burns, No. 87-2014 (Fla. 12th Cir. Ct. order filed Dec. 18, 2000) (Postconviction Order).
Burns appealed the denial of his postconviction motion, raising four issues.[6] Oral argument was held in this Court on February 5, 2002. On February 4, 2002, Burns requested permission to file a supplemental brief concerning whether he met the statutory definition for mental retardation based on section 921.137, Florida Statutes (2000). This Court granted that motion, and Burns and the State filed supplemental briefs. The Supreme Court subsequently released Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), in which it held that the execution of mentally retarded individuals is unconstitutional.
On November 18, 2004, following the enactment of Florida Rule of Criminal Procedure 3.203, we relinquished jurisdiction of this case to the circuit court for a determination of mental retardation. The circuit court held an evidentiary hearing on May 11, 2005, at which the State and the defendant presented expert testimony and submitted other evidence. The circuit *239 court, in an order dated June 10, 2005, found that the defendant did not meet the statutory definition for mental retardation. In his supplemental brief to this Court, Burns appeals that order. We now address the issues Burns raised in his initial and supplemental briefs.

II. ANALYSIS OF ISSUES ON APPEAL
A. Original Postconviction Issues
1. Ineffective Assistance of Penalty Phase Counsel for Failure to Present Expert Mental Mitigation Evidence
Burns first asserts that the postconviction court erred in denying Burns' claim that resentencing counsel were ineffective for failing to present available mental mitigation evidence. To establish a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the defendant was prejudiced by that deficiency. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). An attorney's performance is deficient when it falls below an objective standard of reasonableness under prevailing professional norms. Id. at 688, 104 S.Ct. 2052. Prejudice is demonstrated when "there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694, 104 S.Ct. 2052. In addition, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate from counsel's perspective at the time." Id. at 689, 104 S.Ct. 2052. This Court has stated: "Counsel cannot be deemed ineffective merely because current counsel disagrees with trial counsel's strategic decisions. Moreover, strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." Occhicone v. State, 768 So.2d 1037, 1048 (Fla.2000) (citations omitted).
During the sentencing phase of Burns' initial trial in 1988, Burns called Dr. Robert Berland to testify concerning mental mitigation. Dr. Berland testified that his psychological testing indicated that Burns suffered from a chronic, psychotic disturbance involving a "thought disorder, psychotic thinking." Dr. Berland further testified that a thirteen-point difference between Burns' performance IQ and his verbal IQ indicated a long-term brain impairment of some significance. He thought that at the time of the murder, Burns was suffering from delusional paranoid thinking. Dr. Berland concluded that Burns was suffering from an extreme emotional or mental disturbance.
The State called Dr. Sidney Merin in rebuttal. Based on Dr. Merin's review of Dr. Berland's deposition and test results, statements of Burns and eyewitnesses to the murder, and Dr. Berland's testimony, Dr. Merin concluded that Burns was not under the influence of an extreme mental or emotional disturbance at the time of the murder.
Dr. Berland did not testify at the resentencing, and there was no expert testimony presented as to mental mitigation at the resentencing. Burns argues that counsel's failure to present evidence at the resentencing hearing of Burns' brain damage and psychotic disturbance was ineffective. The resentencing record reveals that counsel considered calling Dr. Berland to testify both at the resentencing before the jury *240 and at the Spencer[7] hearing before the judge. For example, when the State asked the resentencing court to grant Dr. Merin additional time to review Dr. Berland's testimony and testing, Tebrugge, Burns' counsel, responded by saying:
I can tell the Court and the State, Doctor Berland, if he is called would not be called Monday. So Doctor Merin would not need to be here on Monday.
And other than that, I'm not going to say too much. But if he does testify, I don't see any problem with him bringing his test results and copies of that to provide to the state.
(Emphasis added.) During a later portion of the resentencing proceedings, counsel Tebrugge told the trial court:
Doctor Berland, who the defense has retained in this case, . . . was out of town last week to tend to his father who has been very sick. While he was doing that, his grandmother passed away. The funeral for his grandmother is tomorrow and then he'll be flying back into Tampa tomorrow evening. He would be available Wednesday morning.
I don't know at this point in time whether we plan to call Doctor Berland or not, and I've mentioned that to Mr. Moreland.[8] So Doctor Merin wouldn't have to be present tomorrow because Doctor Berland would definitely not be available tomorrow.
We will try to make our decision with respect to calling Doctor Berland so that we can let the Court know that tomorrow so that we . . . won't come in on Wednesday and surprise you. . . .
In addition, Dr. Berland testified at the evidentiary hearing that he received a letter from counsel Tebrugge before the Spencer hearing. Dr. Berland read that letter at the evidentiary hearing:
As you have probably heard by now, the Jury returned a unanimous recommendation of death in Daniel Burns' case. As disappointed as I am with the verdict, I do feel confident that we will ultimately prevail on our legal issues.
Judge Logan has scheduled a hearing . . . for the purpose of taking additional testimony or argument. We are considering calling you as a witness for that hearing. Please let me know if that would present a conflict for you and whether you would need a subpoena. I will try to decide within the next two weeks whether you will be called. Again, thank you for your hard work on this case.
Although counsel did not present any expert testimony on mental mitigation, the defense did present over thirty witnesses at the resentencing, who were mainly family members and close friends of Burns. They testified about the important role Burns played in their family. Burns was described as a leader of the family, and many witnesses testified about the amount of support he provided to them. For example, the defendant's mother, Ethel Burns, testified that after the defendant left his family home in Mississippi, he continued to send money home. One family member described him as a role model. One of his sisters stated that he was "smart, loving and caring." The defense witnesses at resentencing also repeatedly noted that Burns was not a violent person and that this crime was completely out of character for him. Albert Rance, a family friend who had known the defendant since he was a child, testified that he had never known Burns to be violent or have a temper. *241 Barbara A. Burns, the defendant's niece, testified that she had "never heard him behave improperly" or "even yell." Burns' co-counsel, Elliott Metcalfe, stated that the strategy at resentencing was:
[T]o show that Daniel Burns had no significant history of prior criminal activity; that he had lived a life of overcoming . . . [an] extremely difficult poverty-ridden childhood to be a hardworking man; that he had very strong ties to his family.
. . . And [that Burns] was the supporter of all the people in that family and aided and assisted them, including his children.
The defense also called Dr. Michael Radelet, a sociology professor at the University of Florida. Dr. Radelet testified regarding the ability of a prisoner to adjust to confinement and future dangerousness. Dr. Radelet noted that in making assessments of a prisoner's potential future dangerousness, he takes into account seven factors, one of which is substance abuse or a history of mental hospitalizations. He noted: "You can tell if somebody's had problems with alcohol or drug abuse or mental hospitalizations, especially mental hospitalizations. They're more difficult to predict about what's going to go on." He noted that if a prisoner was psychotic, "that leads to unpredictability." Dr. Radelet stated that he "believe[d] very, very strongly that Mr. Burns shows all the traits necessary in order for me to be able to predict that he will be able to make a satisfactory adjustment to life in prison should he be sentenced to life in prison, and that he would do so without threatening guards or other inmates or being at all disruptive to the life in the prison."
During closing arguments, resentencing co-counsel Metcalfe summarized this evidence:
It would be difficult for me to imagine being able to present this much mitigating evidence on behalf of any defendant. This is a rare case where we have a human being, Daniel Burns, who has touched so many lives, so many people.
. . . .
Even more importantly in this case, Members of the Jury, is all of the evidence presented about Daniel Burns' life, his background, his character, and his family. A man must be judged on his whole life, not just on one incident. And all of the evidence that we've presented demonstrates that this crime was totally out of character for Dan Burns, and that is why this evidence is so important.
. . . .
The central fact we've established through the testimony of all of his brothers and sisters is that Daniel Burns has occupied a leadership role in his family. . . . You've heard from each of the nieces . . . that [Burns] was also a surrogate father. . . . [E]ach of these kids, he was a dad to, a brother to, and an uncle to.
To his younger brothers and sisters . . . [Burns] was a teacher, a counselor, a source of love. A source of love, affection and emotional support. And he even continues to do that to this day.
. . . .
We have also established that Daniel Burns will likely be a model prisoner in the future and not pose a danger to anyone. Now, of course, it is difficult to predict the future that Michael Radelet has completed study after study on this phenomena of future dangerousness, and he has identified, as you recall, seven certain fixed criteria.
In every single case, with all seven, [Burns is] at the best end of the scale. And not only will Daniel not be a danger *242 in the future, he can provide guidance and support to the younger inmates who might be incarcerated there.
The postconviction court denied this claim, noting that it relied on this record evidence from the resentencing for its conclusion that counsel's decision to not call Dr. Berland was strategic:
In Burns' case . . . the alleged mental mitigation evidence was actively sought out, evaluated by counsel with knowledge of the likely rebuttal evidence and, as the . . . transcript . . . demonstrate[s], a reasoned decision was made not to present the testimony in light of the other "theme" evidence presented on Burns' behalf. The record in this case strongly supports and convinces this Court to find that Resentence Counsel's alleged failure to present a "mental illness" factor was not an oversight but, rather, was a tactical choice.
Postconviction Order at 12.
At the evidentiary hearing, Burns presented testimony in an attempt to challenge this record evidence. Burns' resentencing counsel Tebrugge testified that after reading Dr. Berland's testimony from the first sentencing, he decided that he would call Dr. Berland for the purpose of presenting mental mitigation testimony. Tebrugge testified that there was no strategic reason why Dr. Berland or another mental health expert did not ultimately testify at Burns' resentencing. He recalled that Dr. Berland was not called because Dr. Berland had a death in his family. Tebrugge could not explain why he did not inform the trial court of the situation, other than to say that he was "just maybe a bit overwhelmed by the entire proceedings."
Co-counsel Metcalfe also testified at the evidentiary hearing. Although Metcalfe believed that Dr. Berland was going to be called as a resentencing witness, he maintained that whether to call Dr. Berland was Tebrugge's decision to make. Metcalfe did not feel that Dr. Berland's testimony would be inconsistent with the testimony of other mitigation witnesses.
Dr. Berland also testified at the evidentiary hearing. He noted that he would have given testimony in 1993 similar to his testimony in 1988: that Burns suffers from a chronic ambulatory psychotic disturbance, has a brain injury, and suffered from an extreme mental or emotional disturbance at the time of the murder.[9] Dr. Berland testified that the effect of Burns' mental illness on Burns during his confrontation with the victim was "a very delicate area to walk on" but felt that whatever misunderstanding occurred between Burns and the victim, Burns' reaction would have been significantly inflamed by his mental illness.
The final witness at the evidentiary hearing, Dr. Henry Dee, testified that he performed a neuropsychological evaluation of Burns. Dr. Dee believed that at the time of the murder, Burns was under the influence of extreme mental or emotional disturbance, and his capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of law was substantially impaired.
In denying this claim, the postconviction court considered the above evidence but still rejected Burns' ineffective assistance claim, noting:
At the evidentiary hearing, neither Tebrugge nor Metcalfe could offer any *243 explanation for their failure to call Dr. Berland at the resentencing proceeding. As well, Dr. Berland had absolutely no independent recollection of why he was not called to testify, either at the resentencing hearing or at the Spencer hearing. Given the lack of recollection by the witnesses at the evidentiary hearing, CCRC's allegations as to Dr. Berland's unavailability to testify as to Resentence Counsel's strategy must be evaluated from counsel's perspective at the time of the resentencing proceeding.
Postconviction Order at 9.
There is competent, substantial evidence to support the postconviction court's finding that resentencing counsel made a strategic decision not to present mental mitigation evidence. Porter v. State, 788 So.2d 917, 923 (Fla.2001) ("So long as its decisions are supported by competent, substantial evidence, this Court will not substitute its judgment for that of the trial court on questions of fact. . . ."). The postconviction court's finding is supported by the transcript of the resentencing, which indicates that Tebrugge considered but eventually rejected the idea of calling Dr. Berland. The record of the resentencing demonstrates that the defense strategy was as co-counsel Metcalfe stated it to be, which was to show that Burns had been a productive member of society who supported and led his family. Counsel also showed through Dr. Radelet that Burns could continue to lead a productive life in prison. Dr. Berland's testimony that Burns suffered from a psychotic disturbance would have undermined the positive traits accentuated by the mitigation evidence presented and vitiated Radelet's resentencing testimony predicting that Burns would make an excellent adjustment to prison life. The sum of the resentencing evidence does not support counsel's postconviction testimony.
Rather, the evidence supports the postconviction court's factual finding that Burns' resentencing counsel were considering calling Dr. Berland but subsequently made a strategic decision not to do so. The fact that resentencing counsel testified that there was not a strategic reason for not presenting mental mitigation does not require the postconviction court to find ineffective assistance. See Breedlove v. State, 692 So.2d 874, 877 n. 3 (Fla.1997) ("[A]n attorney's own admission that he or she was ineffective is of little persuasion in these proceedings."). We do not find error with the postconviction court's decision because it is based on competent, substantial evidence and it is consistent with the evidence in the trial record.[10] The evidence presented at the postconviction hearing would have conflicted with resentencing counsel's trial strategy.
Moreover, we agree with the postconviction court that Burns failed to prove the prejudice prong of the Strickland analysis. The court wrote:
The mental mitigation evidence that Burns alleges should have been offered at the resentencing proceeding would *244 have contradicted the testimony of the numerous lay witnesses who espoused nothing but positive "role model" traits to humanize Burns. The testimony of the numerous lay witnesses at the resentencing proceeding revealed that those who knew Burns thought he was a good person who had never exhibited any violent behavior. The proposed mental mitigation evidence would also have detracted from the expert testimony of Professor Radelet, who characterized Burns as a productive person who would be able to make a satisfactory adjustment to a life sentence in prison.
As well, had Resentence Counsel called Dr. Berland, they would have had to negate the testimony of the State's rebuttal expert witness, Dr. Merin, who would have testified, in accord with his testimony at the original trial, that there was no evidence that Burns was psychotic and that he was not under an extreme emotional or mental disturbance at the time he shot Trooper Young. . . . This Court is also mindful that far less lay testimony was presented at the original trial and both Dr. Berland and Dr. Merin testified. Yet, the jury returned an advisory sentence of death, and the Court imposed a death sentence on Burns.
Postconviction Order at 13. We find no error in the trial judge's determination on prejudice. We thus affirm the postconviction court's denial of this claim.
2. Ineffective Assistance of Resentencing Counsel for Failure to Raise Pretextual Traffic Stop as Mitigating Factor
Burns' second claim is that the postconviction court erred in denying his claim that resentencing counsel were ineffective for failing to present the nonstatutory mitigating circumstance that the initial traffic stop of Burns was pretextual. The postconviction court denied this claim, stating:
[T]he alleged racial profiling . . . would not, however, be a circumstance of the offense of first-degree murder and would have been properly excludable. In any event, this Court cannot conclude that the failure to raise racial profiling as a non-statutory mitigating factor was outside of the range of reasonable professional assistance rendered to Burns at his resentencing proceeding.
Postconviction Order at 15. Burns does not demonstrate how resentencing counsel was deficient for not presenting this evidence. Burns also does not demonstrate how Burns was prejudiced by the lack of this evidence. Therefore, we affirm the postconviction court's finding that Burns did not receive ineffective assistance of counsel for failing to present this evidence. See Strickland, 466 U.S. at 687, 104 S.Ct. 2052.

3. Improper Sentencing Order
Burns' next claim on appeal is that the postconviction court erred in denying his claim that the resentencing court committed fundamental error by failing to file a proper sentencing order. Burns asserts that the resentencing court's sentencing memorandum did not sufficiently list the nonstatutory mitigating circumstances proposed by Burns' resentencing counsel. This claim, based upon a defect in the sentencing order, is procedurally barred because it could have been raised on direct appeal. Suggs v. State, 923 So.2d 419, 439 (Fla.2005).
Burns also contends that resentencing counsel were ineffective for failing to file a motion for rehearing to correct the error in the sentencing order. In denying this claim the postconviction court held:

*245 [A]lthough [Burns] alleges that Resentence Counsel were ineffective for failing to move for a rehearing to correct the trial court's error, CCRC fails to allege or prove any prejudice flowing from this failure. Because the prior sentencing order was comprehensive enough to allow for meaningful review, Resentence Counsel had no meritorious issue to raise in a motion for rehearing. Counsel's failure to raise a nonmeritorious issue does not constitute ineffective assistance.
Postconviction Order at 17. We find no error in the postconviction court's decision on this claim. Burns has failed to allege how he was prejudiced by resentencing counsel's failure to file a motion for rehearing. Again, any defect in the sentencing order should have been raised on direct appeal.

4. Improper Jury Instructions
Burns' final claim in his original appeal is that the postconviction court erred in denying his claim that the jury instructions shifted the burden to Burns to prove that death was inappropriate. The postconviction court found this claim to be procedurally barred and then noted that this Court "has held that a claim based upon counsel's failure to object to alleged burden-shifting penalty phase instructions is without merit as a matter of law." Postconviction Order at 20. The postconviction court did not err. Burns' claim is procedurally barred as it could have been raised on direct appeal. See Downs v. State, 740 So.2d 506, 509 nn. 4-5 (Fla.1999). Furthermore, the postconviction court is correct in stating that this Court has denied as a matter of law the claim of ineffective assistance for failing to object to the alleged burden-shifting instruction. See id. at 509 n. 5. To the extent that Burns raises a claim that the instructions violated the United States Constitution, we note that the Supreme Court recently rejected a similar claim to jury instructions similar to those at issue in the instant case. See Kansas v. Marsh, ___ U.S. ___, ___, 126 S.Ct. 2516, 2525, 165 L.Ed.2d 429 (2006) (finding that Supreme Court precedents do not impose a specific method for balancing aggravating and mitigating factors).

B. Mental Retardation Claims
Finally, Burns challenges the circuit court's determination that he is not mentally retarded in accordance with Florida Rule of Criminal Procedure 3.203. Rule 3.203(b) provides:
As used in this rule, the term "mental retardation" means significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the period from conception to age 18. The term "significantly subaverage general intellectual functioning," for the purpose of this rule, means performance that is two or more standard deviations from the mean score on a standardized intelligence test authorized by the Department of Children and Family Services in rule 65B-4.032 of the Florida Administrative Code. The term "adaptive behavior," for the purpose of this rule, means the effectiveness or degree with which an individual meets the standards of personal independence and social responsibility expected of his or her age, cultural group, and community.
Thus, Burns must prove the following three elements: (1) significant subaverage general intellectual functioning; (2) deficits in adaptive behavior; and (3) manifestation before age 18.

1. Evidentiary Hearing
At the supplemental hearing on this issue, the defendant first presented the testimony of Dr. Henry Dee, a clinical psychologist *246 specializing in neuropsychology, who also testified at the original postconviction evidentiary hearing. Dr. Dee administered the Wechsler Adult Intelligence Scale, Third Edition (WAIS-III) to Burns in 2000, concluding that his full scale IQ was 69. Dr. Dee testified that this score was more than two standard deviations from a mean IQ score of 100, thus indicating that Burns has significantly subaverage intellectual functioning within the meaning of rule 3.203.
Dr. Dee testified that based on an initial impression of Burns' work history and background, he did not think that Burns met the other two prongs of the definition for mental retardation. However, after further investigations and reviewing the record, he concluded otherwise. First, he noted that although Burns graduated from high school, the schools that he attended were known to simply pass students who behaved and did not cause troublethey had an unspoken policy of "social promotion." Dr. Dee learned of this policy after speaking to some of Burns' siblings and a retired teacher who taught in Mississippi schools. Dr. Dee reviewed Burns' school records and determined that his consistent grades of 70, the lowest grade Burns could receive and still pass the grade level, were highly suspect, and so he concluded that Burns was likely simply promoted through grade levels without actually performing at the required passing level. Dr. Dee interviewed several of Burns' siblings, who reported that he performed relatively poorly in school.
Second, Burns' military records, according to Dr. Dee, indicated that Burns had trouble paying attention to instructions and was behind the rest of his class in all phases of his training. The records consistently indicated that all of his trainers recommended that he be separated from the service because of his lack of progress and intelligence. Dr. Dee theorized that the only reason Burns had been able to get into the military was that the entrance exams were verbal, noting that the subtests revealed that Burns performed significantly better on verbal IQ subtests.[11]
Finally, Dr. Dee noted that although Burns co-owned and ran a business with his sister, it was his sister who was responsible for the books and running of the business and that Burns was essentially a crew leader and driver. Dr. Dee concluded that the rest of the jobs that Burns held were simple employment and that people with mild mental retardation[12] were capable of holding these types of jobs.
The State then presented the testimony of Dr. Michael Gamache, a clinical psychologist. Dr. Gamache reported that he reviewed large volumes of records, including examinations of Burns that had been done by other doctors in the past, transcripts from various stages of the case, and other background and historical information. Dr. Gamache also administered the WAIS-III test and determined that Burns had a full scale IQ score of 74. On the subtests Burns scored a performance IQ of 64, a perceptual organization IQ of 67, a verbal comprehension IQ of 78, a verbal IQ of 85, and a working memory IQ of 92. Dr. Gamache noted that he thought that in determining mental retardation, he had to take into account all of these subtest scores because people who are mentally retarded typically have consistently low scores in each of these subtests. Dr. Gamache also noted that the high subtest scores were consistent with scores Burns *247 had received on previously administered IQ tests in 1988 and 1993.
Dr. Gamache testified that in his opinion there was no evidence that Burns met the statutory definition of mental retardation. He stated that the discrepancy in the subtest scores indicated that Burns has a significant cognitive or neuropsychological deficit that relates to his visual and spatial skills. Dr. Gamache noted that Burns is an effective communicator and fully able to care for himself because he engages in various correspondence in prison and keeps himself well-groomed. Dr. Gamache also did not think that Burns' military records could support a finding of mental retardation because Burns' failure to succeed in the military was a combination of his depression, lack of motivation, racism that he faced, as well as low intelligence. Dr. Gamache thought that the jobs that Burns has held also reflected that he did not meet the adaptive functioning prong. He noted that Burns' sister stated in her previous testimony at resentencing that it was Burns' idea to start their business.

2. Standard of Review
Burns first argues that this Court should review the circuit court's determination of mental retardation on a de novo standard. However, in reviewing a determination of mental retardation in previous cases, we have employed the standard of whether competent, substantial evidence supports the circuit court's determination. See Trotter v. State, 932 So.2d 1045, 1049 (Fla.2006). In the instant case, we conclude that competent, substantial evidence supports the circuit judge's determination that Burns is not mentally retarded.

3. Intellectual Functioning
As to the first prong, the experts received different scores when they administered the IQ tests. Burns scored an IQ of 69 on Dr. Dee's test, while he scored an IQ of 74 on Dr. Gamache's test. Thus, there is evidence that he meets this prong because he received at least one IQ score within the mental retardation range. However, Dr. Gamache's testimony provided competent, substantial evidence to explain why Burns' low IQ scores do not necessarily mean that he is mentally retarded. Dr. Gamache explained that in analyzing a variety of subtests, he found that Burns' verbal IQ scores were well above the range typically associated with mental retardation. Dr. Gamache theorized that his range of subtest scores indicates that Burns has a significant intellectual deficit that is specific and circumscribed and related to his visual and spatial skills. The circuit court found this to be a credible explanation for Burns' low IQ and determined that Burns does not meet the first prong of rule 3.203. Credibility is a determination made by the circuit court, which this Court defers to provided that there is competent, substantial evidence to support that determination. Porter v. State, 788 So.2d 917, 923 (Fla.2001). We have stated that we "recognize and honor the trial court's superior vantage point in assessing the credibility of witnesses and in making findings of fact." Id. We thus find that there is competent, substantial evidence to support the circuit court's conclusion that Dr. Gamache's testimony that Burns does not meet this first prong of the mental retardation determination was the more credible expert testimony.

4. Adaptive Behavior
Even if we concluded that Burns demonstrated that his intellectual functioning was significantly subaverage, he still must meet the other two prongs of the mental retardation standard in rule 3.203. Low IQ alone does not necessarily mean *248 that a person is mentally retarded. Rodriguez v. State, 919 So.2d 1252, 1266 (Fla. 2005). The second prong is that the defendant must show a deficit in his adaptive behavior. In addressing this prong, we have noted:
According to the Diagnostic and Statistical Manual of Mental Disorders, mental retardation is "characterized by significantly subaverage intellectual functioning (an IQ of approximately 70 or below) with onset before age 18 years and concurrent deficits or impairments in adaptive functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 39 (4th ed.2000). Even where an individual's IQ is lower than 70, mental retardation would not be diagnosed if there are no significant deficits or impairments in adaptive functioning. Id. at 42. Adaptive functioning refers to "how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." Id. In order for mental retardation to be diagnosed, there must be significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety. Id. at 41.
Id. at 1266 n. 8.
We find that there was competent, substantial evidence for the circuit court to determine that Burns also failed to prove this prong. First, the State presented evidence that Burns was always able to support himself. Burns co-owned a watermelon hauling company with his sister, for which, even according to Dr. Dee's testimony, Burns served at least as a crew leader and driver. Burns also worked as a cab driver and on an assembly line.
As set forth in the discussion of the first issue in this opinion, much of the testimony presented at Burns' 1994 resentencing directly conflicts with the evidence presented in support of the mental retardation claim he now makes. Burns' mother and several of his seventeen brothers and sisters testified that Burns provided much financial support to the family after he graduated from high school. Several witnesses described him as intelligent and smart, and noted that he emphasized to his younger siblings the importance of education. Finally, while his sister who ran a business with him, Vera Theresa Labao, told Dr. Dee that Burns was only a driver for their company, at the resentencing she credited him with having the idea to start their business. In fact, the first mitigating factor listed in our opinion on the appeal of the resentencing is: "Burns was one of seventeen children raised in a poor rural environment and consequently had few economic, educational, or social advantages, but despite these disadvantages, he is intelligent and became continuously employed after high school." Burns II, 699 So.2d at 648 (emphasis added).
Although Burns was discharged from the military and Dr. Dee testified that reports there labeled him as unintelligent, Dr. Gamache theorized that the poor reports Burns received were likely a result of a combination of depression, motivation, racism, and low intelligence. He noted that Burns' records provided instances where Burns refused to follow orders, not that his intelligence prevented him from following orders.
We find that there was competent, substantial evidence to support the lower court's determination that Burns did not meet the adaptive behavior prong. The *249 evidence shows that Burns maintained employment throughout his time before his arrest and was fully able to support himself. Also, Burns is able to communicate well and keeps himself well-groomed. At the resentencing, his friends and family testified that he continued to be a leader in their family and stay in touch despite being in prison. The evidence presented by the State and relied on by Dr. Gamache was competent and substantial, and we therefore find no error in the circuit court's determination that Burns failed to prove this second prong.

5. Onset Before Age Eighteen
There is competent, substantial evidence to support the circuit court's determination on the third prong as well. Burns graduated from high school, never failing a grade, and earning good marks in self-care and behavior areas. Although Burns argues that his passing grades were merely the effect of a silent policy of social promotion, we defer to the circuit court's determination on this fact. Although Burns provided evidence that a policy of social promotion was in place, no evidence was presented that this policy was specifically applied to Burns. There was no evidence that Burns met the statutory definition of mental retardation before the age of eighteen.

6. Conclusion
Thus, because the circuit court's determination that Burns failed to meet any of the three prongs of the mental retardation definition is supported by competent, substantial evidence, we affirm the circuit court's denial of Burns' motion for a determination of mental retardation.[13]

III. CONCLUSION
Because Burns has failed to raise any issue with merit, we affirm the circuit court's denial of his postconviction motion and the circuit court's determination that Burns is not mentally retarded.
It is so ordered.
LEWIS, C.J., and WELLS, ANSTEAD, PARIENTE, CANTERO, and BELL, JJ., concur.
QUINCE, J., recused.
NOTES
[1] The aggravating factors found were: (1) the victim was engaged in the performance of his official duties as a highway patrol trooper when he was murdered by Burns; (2) the murder was committed by Burns to avoid arrest or to effect an escape from the victim's custody for the crime of trafficking in cocaine; and (3) the murder was committed to disrupt the lawful exercise of enforcement of laws by the victim relating to trafficking in cocaine. The trial judge merged the aggravators because they were all based on the fact that the victim was a law enforcement officer.
[2] The statutory mitigating factors found were: (1) Burns was forty-two years old at the time of the murder; and (2) Burns had no significant prior criminal activity. The trial judge gave these mitigating factors reduced weight due to Burns' 1976 gambling conviction and testimony that in the months just prior to the murder, Burns possessed crack cocaine and delivered it to others.
[3] The nonstatutory mitigating factors found were: (1) Burns was raised in a poor, rural environment, but despite economic disadvantages, Burns is intelligent and became continuously employed after high school; (2) Burns contributed to his community and society, is intelligent and graduated from high school, worked hard to support his family, with whom he developed a caring relationship, and was honorably discharged from the military; and (3) Burns has shown some remorse, has a good prison record, behaved appropriately in court, and has demonstrated some spiritual growth. The trial judge questioned whether Burns' remorse and spiritual growth were self-serving.
[4] Burns raised the following issues in his motion: (1) Burns' resentencing counsel was ineffective; (2) the resentencing judge committed fundamental error by failing to discuss mitigating circumstances in the sentencing order and counsel was ineffective for failing to file a motion for rehearing; (3) lethal injection and electrocution constitute cruel and unusual punishments; (4) Burns' counsel was ineffective for not arguing that Florida's capital sentencing statute is unconstitutional; (5) the resentencing jury instructions improperly shifted the burden to Burns to prove that death was not the appropriate sentence; (6) Florida's capital sentencing statute is unconstitutional; and (7) cumulative trial errors deprived Burns of a fair trial.
[5] Huff v. State, 622 So.2d 982 (Fla.1993).
[6] Burns has raised the following four issues on appeal: (1) whether resentencing counsel was ineffective for failing to present available mitigation evidence; (2) whether resentencing counsel was ineffective for failing to present the nonstatutory mitigating circumstance that the initial traffic stop of Burns was pretextual; (3) whether the resentencing court committed fundamental error in filing an improper sentencing order and counsel was ineffective for not filing a motion to correct the order; and (4) whether jury instructions shifted the burden to Burns to prove that the death sentence was inappropriate.
[7] Spencer v. State, 615 So.2d 688 (Fla.1993).
[8] Assistant State Attorney Earl Moreland was the prosecuting attorney at Burns' resentencing.
[9] The postconviction court noted, however, that Dr. Berland had no evidence "that Burns suffered from delusions or hallucinations at the time of the shooting, nor had he noted anything in the police statements in 1988 that indicated Burns was suffering from mental illness." Postconviction Order at 7.
[10] In Rutherford v. State, 727 So.2d 216, 223 (Fla.1998), this Court held that a trial court did not err in finding that trial counsel was not deficient for failing to present mental health testimony, when "trial counsel was aware of possible mental mitigation, but made a strategic decision under the circumstances of this case to instead focus on the `humanization' of [the defendant] through lay testimony." Id. In the instant case, resentencing counsel were admittedly aware of, and had extensively investigated, the potential mental mitigation testimony. This investigation distinguishes the instant case from those cases cited by Burns for support of his argument. See, e.g., Hildwin v. State, 654 So.2d 107, 109 (Fla.1995) (penalty-phase counsel was ineffective because he "failed to unearth a large amount of mitigating evidence").
[11] Burns' verbal IQ was 79, while his performance IQ was 62.
[12] Mild mental retardation means that the person has an IQ in the range of 55 to 70.
[13] Burns also argues that the circuit court's use of the clear and convincing evidence standard was unconstitutional. Section 921.137(4) sets out the clear and convincing evidence standard as the appropriate standard to be used in determining mental retardation. We do not need to address claims of unconstitutionality, however, because the circuit court noted that Burns failed to establish mental retardation by either clear and convincing evidence or by a preponderance of the evidence. We avoid reaching a constitutional issue if a case can be determined on other grounds. Singletary v. State, 322 So.2d 551, 552 (Fla.1975).