PERRY, J.,
dissenting.
If the bar against executing the mentally retarded is to mean anything, Freddie Lee Hall cannot be executed. Hall “has been retarded his whole life.” I do not disagree with my esteemed colleagues that section 921.137(1), Florida Statutes (2012), and our caselaw provide that a defendant must establish an IQ below 70 to be ineligible to be executed, but that statute as applied here reaches an absurd result. Because this is my belief, I respectfully dissent.
The record before us is replete with indications of Hall’s mental retardation. This Court has twice noted the evidence demonstrating Hall’s mental retardation:
The testimony reflects that Hall has an IQ of 60; he suffers from organic brain damage, chronic psychosis, a speech impediment, and a learning disability; he is functionally illiterate; and he has a short-term memory equivalent to that of a first grader. The defense’s four expert witnesses who testified regarding Hall’s mental condition stated that his handicaps would have affected him at the time of the crime. As the trial judge noted in the resentencing order, Freddie Lee Hall was “raised under the most horrible family circumstances imaginable.” '
Indeed, the trial judge found that Hall had established substantial mitigation. The judge wrote that the evidence conclusively demonstrated that Hall “may have been suffering from mental and emotional disturbances and may have been, to some extent, unable to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.” Additionally, the judge found that Hall suffers from organic brain damage, has been mentally retarded all of his life, suffers from mental illness, suffered tremendous emotional deprivation and disturbances throughout his life, suffered tremendous physical abuse and torture as a child, and has learning disabilities and a distinct speech impedi *719 ment that adversely affected his development.
Hall’s mental deficiency as an adult is not surprising. The sixteenth of seventeen children, Hall was tortured by his mother and abused by neighbors. Various relatives testified that Hall’s mother tied him in a “croaker” sack, swung it over a fire, and beat him; buried him in the sand up to his neck to “strengthen his legs”; tied his hands to a rope that was attached to a ceiling beam and beat him while he was naked; locked him in a smokehouse for long intervals; and held a gun on Hall and his siblings while she poked them with sticks. Hall’s mother withheld food from her children because she believed a famine was imminent, and she allowed neighbors to punish Hall by forcing him to stay underneath a bed for an entire day.
Hall’s school records reflect his mental deficiencies. His teachers in the fourth, sixth, seventh, and eighth grades described him as mentally retarded. His fifth grade teacher stated that he was mentally maladjusted, and still another teacher wrote that “his mental maturity is far below his chronological age.”
Hall VIII, 742 So.2d at 231 (Anstead, J. specially concurring) (quoting Hall VII, 614 So.2d at 479-80 (Barkett, C.J. dissenting)). Hall is a poster child for mental retardation claims because the record here clearly demonstrates that Hall is mentally retarded. The fact that our statutory standard does not agree only serves to illustrate a flaw in the statute.
As the United States Supreme Court articulated in Atkins, those with disabilities in areas of reasoning, judgment, and control of their impulses “do not act with the level of moral culpability that characterizes the most serious adult criminal conduct.” Atkins, 536 U.S. at 306, 122 S.Ct. 2242. Indeed, “our society views mentally retarded offenders as categorically less culpable than the average criminal.” Id. at 316, 122 S.Ct. 2242. Thus, while there is agreement about the execution of mentally retarded offenders, there remains disagreement, and difficulty, in determining which offenders are retarded. “Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus.” Id. at 317, 122 S.Ct. 2242. Atkins thus left this determination to the states.
Prior to Atkins, this State adopted section 921.137, which provides in relevant part:
The term “significantly subaverage general intellectual functioning,” for the purpose of this section, means performance that is two or more standard deviations from the mean score on a standardized intelligence test specified in the rules of the Agency for Persons with Disabilities.
§ 921.137(1), Fla. Stat. (2012)
As we observed in Cherry, mental health practitioners are expected to look at IQ as a range rather than an absolute.
The concept of mental retardation is considered to be a range or band of scores, not just one score or a specific cutoff for mental retardation. The idea behind that is there’s recognition that no one IQ score is exact or succinct, that there’s always some variability and some error built in.
And the Diagnostic and Statistical manual which is what we — meaning the mental health professionals — rely on when arriving at diagnostic hypotheses. That manual guides us to look at IQ scores as being a range rather than absolute. And the manual talks about a score from 65, a band, so to speak, from *720 65 to 75 — and of course, lower than 65— comprising mental retardation.
Cherry, 959 So.2d at 711-12 (quoting Dr. Peter Bursten). Nevertheless, this Court was constrained by the language of the statute and found that an IQ higher than 70 failed to meet the first prong of section 921.137(1), and that no further inquiry was necessary. Id. at 714.
Thus far, our interpretation of the statute and applicable rule has led us to a dogged adherence to a bright-line cutoff of a score of 70 on the IQ test.[9] Yet, even when a defendant is able to demonstrate a lower IQ, the rest of the statute allows the courts to reason that the defendant is not mentally retarded. See, e.g., Dufour v. State, 69 So.3d 235, 244-53 (Fla.2011) (finding that despite IQ scores of 62, 67, and 74, Dufour failed to establish deficits in adaptive functioning because he was able to complete his GED and live independently); Hodges v. State, 55 So.3d 515, 527, 535 (Fla.2010)(fínding that although Hodges had IQ scores of 62, 66, and 69, he did not establish deficits in adaptive functioning because he was able to copy letters drafted by others and sign his own name and was able to support himself as a short-order cook, garbage collector, and dishwasher); Rodgers v. State, 948 So.2d 655, 661 (Fla.2006) (finding that the trial court did not err in finding that the defense expert’s recitation of Rodgers’ IQ of 69 was less credible evidence than court-appointed experts who found higher IQs); Burns v. State, 944 So.2d 234, 248 (Fla.2006) (finding that despite an IQ of 69, Burns was unable to establish deficits in adaptive functioning because he was able to support himself); Rodriguez v. State, 919 So.2d 1252, 1266 (Fla.2005) (finding that despite his low IQ, his behavior in trial proceedings indicated that he was not mentally retarded). We have interpreted the statute as requiring a threshold for the courts to even consider retardation, but then allow the same courts to subjectively reason away the bar to execution. Thus, under this interpretation of the statutory scheme, a defendant can be found mentally retarded but not have it serve as a bar to execution because his IQ is too high, and if his IQ is low enough, he can still be found not to be mentally retarded because he can hold a pen to paper. Thus, it appears there is no reasonable way to be declared mentally retarded for the purposes of proving ineligibility for execution in Florida. If the proscription against executing the mentally retarded is to mean anything, it cannot be wielded as this double-edged sword.
The current interpretation of the statutory scheme will lead to the execution of a retarded man in this case. Hall had been found by the courts to be mentally retarded before the statute was adopted. Once the statute is applied, Hall morphs from someone who has been “mentally retarded his entire life” to someone who is statutorily barred from attempting to demonstrate concurrent deficits in adaptive functioning to establish retardation. Because this cannot be in the interest of justice, I dissent.
LABARGA, J., concurs.

. This is so even despite subsection four of section 921.137, which provides, in part:
At the final sentencing hearing, the court shall consider the findings of the court-appointed experts and consider the findings of any other expert which is offered by the state or the defense on the issue of whether the defendant has mental retardation.
§ 921.137(4), Fla. Stat. (2012); see also Fla. R. Admin. P. 65G-4.011(2) (2012).