# Supreme Court of Florida

_____

No. SC18-88
_____

**TROY MERCK, JR.,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

December 28, 2018

PER CURIAM.

This case is before the Court on appeal from an order denying Troy Merck's

successive motion to vacate a judgment of conviction of first-degree murder under

Florida Rule of Criminal Procedure 3.851. Because the order concerns

postconviction relief from a capital conviction for which a sentence of death was

imposed, this Court has jurisdiction of the appeal under article V, section 3(b)(1) of

the Florida Constitution.[1] Merck contends that the postconviction court erred in

---

1. The State contests this Court's jurisdiction because Merck is awaiting resentencing under *Hurst v. Florida*, 136 S. Ct. 616 (2016), and *Hurst v. State*, 202 So. 3d 40 (Fla. 2016), *cert. denied*, 137 S. Ct. 2161 (2017). However, the pending

denying his overlapping claims of newly discovered evidence and violations of *Giglio v. United States*, 405 U.S. 150 (1972), and *Brady v. Maryland*, 373 U.S. 83 (1963). For the reasons explained below, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

Merck was convicted of the first-degree murder of James Newton and sentenced to death, and his conviction was affirmed on direct appeal in 1995. *Merck v. State* (*Merck I*), 664 So. 2d 939, 940 (Fla. 1995). We have since affirmed the denial of Merck's initial motion for postconviction relief and denied his petition for writ of habeas corpus. *Merck v. State* (*Merck IV*), 124 So. 3d 785, 790 (Fla. 2013). However, errors in the sentencing process have required resentencing on two prior occasions, *Merck I*, 664 So. 2d at 944; *Merck v. State* (*Merck II*), 763 So. 2d 295, 299 (Fla. 2000), and Merck is presently awaiting his third resentencing due to *Hurst* error in his most recent penalty phase.[2]

_____

resentencing does not affect our exclusive jurisdiction over this appeal. *See Farina v. State*, 191 So. 3d 454, 455 (Fla. 2016).

2. Merck's most recent penalty phase took place in 2004, and the resulting death sentence became final in 2008. *Merck v. State* (*Merck III*), 975 So. 2d 1054 (Fla. 2007), *cert. denied*, 555 U.S. 840 (2008). The trial court granted Merck's postconviction motion seeking *Hurst* relief before ruling on the motion at issue in this appeal. The State voluntarily dismissed its appeal from the order granting Merck *Hurst* relief.

The subject of this appeal is Merck's first successive motion for postconviction relief. In that motion, Merck alleged violations of *Giglio* and *Brady*, as well as a more general claim of newly discovered evidence, based on information his postconviction investigator recently obtained from Neil Thomas, a key witness for the State at Merck's trial. Because Merck has been granted a new penalty phase, the issues addressed in this decision pertain to his conviction only.

In Merck's first appeal, we described the facts of the crime as follows:

> Newton died after Merck repeatedly stabbed him . . . in the parking lot of a bar in Pinellas County shortly after 2 a.m. on October [11], 1991. The bar had closed at 2 a.m., and several patrons of the bar remained in the parking lot. The evidence was that several of these individuals, including the victim, Merck, and those who witnessed the murder, had consumed a substantial amount of alcohol during the evening while at the bar.
>
> After closing, Merck and his companion [Thomas], both of whom had recently come to Florida from North Carolina, were in the bar's parking lot. The two were either close to or leaning on a vehicle in which several people were sitting. One of the car's occupants asked them not to lean on the car. Merck and [Thomas] sarcastically apologized. The victim approached the car and began talking to the car's owner [Katherine Sullivan]. When Merck overheard the owner congratulate the victim on his birthday, Merck made a snide remark. The victim responded by telling Merck to mind his own business. Merck attempted to provoke the victim to fight; however, the victim refused.
>
> Merck then asked [Thomas] for the keys to the car in which he had come to the bar [which was a Mercury Bobcat]. At the car, Merck unlocked the passenger-side door and took off his shirt and threw it in the back seat. Thereafter, Merck approached the victim, telling the victim that Merck was going to "teach him how to bleed." Merck rushed the victim and began hitting him in the back with punches. [Sullivan] testified that she saw a glint of light from some sort of blade and saw blood spots on the victim's back. The victim

fell to the ground and died from multiple stab wounds; the main fatal wound was to the neck.

*Merck I*, 664 So. 2d at 940-41.

Merck had two theories of defense. First, he argued that there was a reasonable doubt as to whether he, rather than Thomas, was the attacker. Second, he argued that if he was the attacker, he was so intoxicated that he "blacked out" and did not remember it and, therefore, could not have formed the intent to commit premeditated first-degree murder.[3]

The trial evidence showed that Thomas and Merck spent approximately four hours at the bar before the murder. Merck testified that he consumed twelve to fifteen beers and eight to ten shots of liquor during this time. In contrast, Thomas testified that he and Merck each consumed approximately six beers and two or three shots of liquor. Thomas testified that he felt "buzzed pretty good" and that Merck did not show any effects from his consumption of alcohol. Merck did not seem to be having any trouble walking, standing, or talking, and Merck responded appropriately when Thomas spoke to him. Sullivan also testified that the attacker,

---

3. Voluntary intoxication was a defense to specific-intent crimes at the time of Merck's trial, *see Gardner v. State*, 480 So. 2d 91, 92 (Fla. 1985), but that defense has since been abrogated by statute. § 775.051, Fla. Stat. (2018); ch. 99-174, § 1, Laws of Fla. (creating section 775.051, effective October 1, 1999).

whom she identified as Merck both in court and before trial, had no trouble walking or talking.[4]

According to Thomas, after the attack was over, Merck urged him to "[c]ome on," and Thomas then got into the Bobcat and drove away with Merck, asking Merck if he had stabbed Newton. Thomas recalled that Merck held up a bloody knife, announced that he had killed Newton, and said that if he had not succeeded in killing Newton, he would go to the hospital and "finish what [he] started." Thomas testified that Merck described the attack repeatedly from that point forward. At some point, Merck explained to Thomas that he decided to kill Newton when Newton failed to back down from the confrontation as Merck approached him.

Thomas testified that after escaping the scene, he parked the Bobcat at an apartment complex, where he and Merck began to change clothes. Thomas recounted that as he and Merck were in the parking lot, Thomas saw a patrol car slam on its brakes and turn around, at which point he and Merck ran. They hid in some bushes and then made their way to a Burger King, where they called a cab. Merck and Thomas had the driver drop them off at a bowling alley across the street

---

4. No witness identified Thomas as the person who stabbed and killed Newton. However, Merck argues now, as he did to the jury, that certain aspects of the eyewitness testimony would point to Thomas as the perpetrator. Although we do not find it necessary to detail this evidence, we have not overlooked it in considering materiality or the probability of an acquittal on retrial.

from a motel where they intended to stay. However, before going to the motel, they played a game of pool, and Merck had no difficulty with the game. According to Thomas, once they arrived at the motel, Merck continued describing the attack. Thomas testified that Merck did not pass out or start sleeping or "anything like that" and that Merck did not seem to have any difficulty remembering what happened.

Contrary to Thomas's account of Merck's actions and demeanor, Merck testified that after he heard Thomas calling Newton a name, he leaned down to pick something up and that the next thing he remembers is leaning on the Bobcat and hearing Thomas tell him to hurry up and change clothes. Merck testified that he remembered running with Thomas when they saw a patrol car. He also testified that he remembered going to "a Hardee's or something," lying in some bushes, and taking a cab to a bowling alley where he went in and shot pool. The next thing he remembered after that was waking up the next morning at a motel. According to Merck, after he told Thomas he did not remember the night before, Thomas told him that they had been in a fight and, later, that Merck had stabbed someone.

Thomas and Merck both testified that three females joined them at the motel during the weekend after the stabbing. Two of these females testified that, although Merck described the stabbing and claimed to have done it, he was often interrupted by Thomas, who supplied and corrected details of Merck's account

while Merck looked as though he did not really believe he did what Thomas attributed to him. The third female contradicted this testimony, stating that Thomas did not take part in recounting the incident.

A couple of days after the stabbing, Thomas walked away from the motel and arranged to be picked up at another location. When his contact arrived, he was advised that the police were on their way as well. Thomas was reluctant to talk to the police at first, but he ultimately told the police where Merck was and learned a few minutes later that Merck was in custody. Thomas gave a sworn statement that same day, giving essentially the same account that he later presented at trial. At trial, Thomas testified that no one had threatened him to get him to "tell what [he] knew about the incident."

### *GIGLIO*, *BRADY*, AND NEWLY DISCOVERED EVIDENCE CLAIMS

The successive postconviction motion at issue in this appeal relates to Thomas's testimony concerning Merck's level of intoxication, as well as Thomas's motivation to testify and to minimize Merck's level of intoxication. The postconviction court granted Merck an evidentiary hearing, where it received the testimony of Thomas, as well as Merck's trial counsel, Merck's initial postconviction counsel, and Merck's current postconviction investigator. Merck relied on portions of this testimony to support each of his claims: a *Giglio* claim, a

*Brady* claim, and a newly discovered evidence claim. However, the main substance of each claim is based on Thomas's testimony.

At the evidentiary hearing, Thomas testified that the State had advised him that if he did not attend Merck's trial to testify, then a "protective custody warrant" would be issued and he would "be held in jail until [he] did testify." Merck submitted into evidence a motion the State had filed under a case styled against Thomas, indicating that Thomas was a material witness. Thomas confirmed that this filing was the reason he participated in the trial. Indeed, he had failed to appear to testify in an earlier trial of this case, which resulted in a hung jury.

Regarding the substance of his trial testimony, Thomas testified at the evidentiary hearing that he had always been "bothered" by a concern that Merck "was probably a little bit more intoxicated than what [Thomas] had said" at trial. He opined that Merck was "a lightweight" when it came to drinking alcohol and that Merck was, in fact, "very, very drunk," or "highly intoxicated," at the time of the stabbing. Thomas noted that he was much larger than Merck and, accordingly, that Merck "may have been a lot drunker than [Thomas] was." Thomas's recollection at the time of the evidentiary hearing was that he and Merck had been "drinking pretty much the same amount," although Merck also drank some tequila and Thomas did not.

Another concern that had "stuck with [Thomas] all this time" and troubled him was that he failed to mention a particular occurrence during his trial testimony. Specifically, Thomas did not mention that he had "a hard time getting [Merck] to respond to him" and to get out of the car to change clothes after the getaway. Thomas explained that, while he was testifying previously, he had a "picture in [his] head," which was a memory, or a "flash in [his] mind," of Merck "kind of slumped over" and not responding to him. Thomas explained that he did not mention this memory at the time because there were other questions "coming at [him]" from the attorneys and he focused on those questions. Thomas was equivocal concerning whether he had this memory during the guilt-phase trial or at some other time when he was being questioned under oath. However, at one point, he concluded that "it was the last time that [he] testified"—which the record shows was at Merck's most recent resentencing in 2004.

Thomas also testified at the evidentiary hearing that, just before trial, he told the prosecutor he was having difficulty remembering how many drinks he and Merck had consumed on the night of the stabbing. According to Thomas, the prosecutor responded by telling him that he "need[ed] to stick to" what he said in his deposition. Thomas confirmed that he had taken this approach while testifying and that he took the instruction to mean that if he could not remember something, he should "refer to what [he] had already said because that would have been [at] an

earlier time" when his recollection was better.  However, Thomas also testified that he was instructed to review the deposition to refresh his memory.  Additionally, he noted that the prosecutor had commented that his memory would have been fresher at the time of the deposition, "or at least [at the time of] the statement that [he] had given to police."

Although Thomas indicated that he understood the instruction to be that he should repeat what he said earlier if he did not have an independent recollection, he did not have the impression that the prosecutor was "intentionally trying to . . . coerce [his] testimony or anything like that."  When asked if he had ever said that he was told to minimize Merck's level of intoxication, Thomas answered, "I may have said that," and then explained that he was referring to the conversation about his failing memory as to the number of drinks he and Merck consumed and the instruction to refer to his deposition.

When asked if he had changed his mind about whether Merck would have known what he was doing and remembered what he was doing, Thomas answered, "No.  Nothing else is different."  Thomas confirmed that, just as he indicated at trial, Merck could not stop talking about the murder after Merck committed it and that he was "rather proud of it."  Thomas also confirmed that Merck held the bloody knife up in the car and said that if Newton was not dead, he would go to the

hospital and finish killing him. He affirmed that he told the truth at trial to the best of his ability and was not trying to mislead anyone.

After the hearing, the postconviction court denied each claim, and Merck argues on appeal that each denial was erroneous.

## ANALYSIS

We address each claim in turn, reviewing the postconviction court's factual findings for competent, substantial evidence, *Waterhouse v. State*, 82 So. 3d 84, 101 (Fla. 2012) (quoting *Hitchcock v. State*, 991 So. 2d 337, 349 (Fla. 2008)), and its application of the law to the facts de novo. *Brooks v. State*, 175 So. 3d 204, 231 (Fla. 2015).

### *Giglio* Claim

A *Giglio* claim consists of the following elements: "(1) the prosecutor presented or failed to correct false testimony; (2) the prosecutor knew the testimony was false; and (3) the false evidence was material." *Geralds v. State*, 111 So. 3d 778, 791-92 (Fla. 2010) (citing *Guzman v. State*, 941 So. 2d 1045, 1050 (Fla. 2006)). False testimony presented in violation of *Giglio* is material "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Guzman v. State*, 868 So. 2d 498, 506 (Fla. 2003) (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)). Thus, "[t]he State, as the beneficiary of the *Giglio* violation, bears the burden to prove that the presentation

- 11 -

of false testimony at trial was harmless beyond a reasonable doubt." *Id*. (citing *United States v. Bagley*, 473 U.S. 667, 679 n.9 (1985)).

In denying Merck's *Giglio* claim, the postconviction court found that Merck failed to establish either that Thomas gave false testimony or that the State knowingly presented false testimony. On appeal, Merck argues that the postconviction court erred in failing to find that the State committed *Giglio* violations in the following ways: (1) by presenting Thomas's testimony about Merck's level of intoxication and the amount of alcohol he drank as Thomas's clear recollection, when, in fact, Thomas told the prosecutor that he was having difficulty remembering and Thomas was instructed to "stick to" his deposition, which was given only a month before trial; (2) by eliciting testimony from Thomas that he had not been threatened as an inducement for his testimony when, in fact, he was threatened with arrest if he failed to appear for trial; and (3) by failing to correct Thomas's testimony that he had not been promised anything when, in fact, there was an undisclosed *quid pro quo*, as revealed by the fact that Thomas asked for and received help with his violation of probation charge in 1997. For the reasons explained below, these points do not establish *Giglio* violations.

First, Thomas's postconviction testimony, as construed and credited by the postconviction court, refutes Merck's claim that the State presented false evidence by instructing Thomas to "stick to" his deposition concerning the amount of

- 12 -

alcohol Merck consumed and his level of intoxication. Although Thomas may have interpreted the prosecutor's instruction as a directive to repeat what he said in his deposition even if he did not remember the facts independently, there was a conflict in the evidence concerning the crucial question of whether the prosecutor intended to give such a directive and, therefore, could be said to have "knowingly" done so. Thomas's evidentiary-hearing testimony itself was subject to different interpretations on this question. Also, the interpretation of the prosecutor's instruction as a recommendation that Thomas rely on the deposition to refresh his memory, rather than dictate his trial testimony, was supported by Merck's trial counsel's testimony that it is common practice to have witnesses review their prior statements before they testify at trial.[5]

It was for the postconviction court to resolve the factual issue concerning the meaning of the exchange between the prosecutor and Thomas. *See Porter v. State*, 788 So. 2d 917, 923 (Fla. 2001) ("So long as its decisions are supported by competent, substantial evidence, this Court will not substitute its judgment for that of the trial court on questions of fact and, likewise, on the credibility of the witnesses and the weight to be given to the evidence by the trial court."). The court resolved the issue in favor of the State's position, crediting the portion of

---

5. The prosecutor whose instruction is in question is deceased.

Thomas's testimony indicating that the prosecutor had told him to look at his previous testimony to refresh his memory because that testimony was given closer in time to the events at issue.[6] Of course, such an instruction is not improper. *Cf. Wilcox v. State*, 143 So. 3d 359, 378 (Fla. 2014) (recognizing the practice of refreshing a witness's recollection during trial, even with a writing produced by someone else, and finding error in the trial court's failure to allow the defendant to do so). Merck's argument on appeal is an improper attempt to have us reweigh the evidence and make a different factual finding as to the nature of the instruction given. *See Porter*, 788 So. 2d at 923. We decline to do so. The postconviction court's findings are supported by competent, substantial evidence and belie Merck's position.

Second, Merck's postconviction evidence is insufficient to establish that Thomas testified falsely when he said that no one had threatened him to induce him to "tell what [he] knew about the incident." Merck argues that this testimony

---

6. Merck insists that this instruction was improper and implies that it was made in bad faith because the deposition was taken only one month before trial. However, Thomas's testimony indicates that he did not understand the difference between his deposition and the statement that was taken under oath in a question-and-answer format on October 14, 1991, just days after the murder. The deposition and the statement were substantively the same, and on at least one occasion during his recent postconviction testimony, Thomas referred to the statement as a deposition. He also suggested at one point that the instruction to rely on his prior testimony may have been given to him before one of Merck's resentencing proceedings, in reference to his original trial testimony.

- 14 -

was false because the State had threatened to hold Thomas in jail until he testified if he failed to appear for Merck's second trial. However, this evidence does not support a conclusion that Thomas testified falsely when he said no one threatened him to get him to "tell what [he] knew about the incident," as the trial evidence shows that Thomas spoke to the police voluntarily shortly after he left Merck's company. The record also shows that Thomas gave a sworn statement that same day and provided essentially the same account that he told at trial. Thus, the record supports the conclusion that Thomas volunteered to tell what he knew about the incident. Furthermore, the trial testimony concerning threats can be reasonably understood as referring to the substance of Thomas's testimony, not the compulsion of his attendance at trial. For these reasons, the postconviction court's finding that Thomas did not testify falsely is supported by the record and is not undermined by the evidence that Thomas's attendance at trial was compelled by the threat of arrest.

Third, Merck has failed to establish a *Giglio* violation concerning an alleged *quid pro quo* agreement between Thomas and the prosecutor, which Merck says is evidenced by assistance Thomas received from Merck's prosecutor in 1997 in resolving an unrelated charge of violation of probation. This claim is untimely because Thomas testified about the assistance he received with the violation of probation in 2004 at Merck's second resentencing. *See Jimenez v. State*, 997 So.

2d 1056, 1064 (Fla. 2008) (citing *Mills v. State*, 684 So. 2d 801, 804-05 (Fla. 1996)) (explaining that a successive motion for postconviction relief alleging newly discovered evidence in a death-penalty case is untimely if it is not filed within one year of the date the claim became discoverable through due diligence). However, even if this claim were not untimely, the evidence does not establish a *quid pro quo* agreement. Thomas testified that he reached out to the prosecutor on his own initiative and was told that he should not be doing so but that the prosecutor would "see what he could do," and this event occurred long after Merck's trial.

In addition, Merck argues that this evidence must be considered cumulatively with other evidence that he presented previously in postconviction proceedings and evaluated under the *Giglio* standard of materiality. However, as shown by the foregoing analysis, the motion under consideration does not involve any *Giglio* evidence. Thus, the cumulative claim fails.

For the foregoing reasons, Merck's *Giglio* claim is without merit.

### *Brady* Claim

A *Brady* claim has three elements: (1) evidence must be identified that would have been favorable to the defense because it was either exculpatory or impeaching; (2) the defendant must show that the State suppressed the evidence, either willfully or inadvertently; and (3) the defendant must show that he was

prejudiced by the suppression of the evidence. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *see Brady*, 373 U.S. at 87. The prejudice prong requires a showing that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Mordenti v. State*, 894 So. 2d 161, 170 (Fla. 2004) (quoting *Strickler*, 527 U.S. at 280); *see also Bagley*, 473 U.S. at 682. This standard is met by showing that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Mordenti*, 894 So. 2d at 170 (quoting *Allen v. State*, 854 So. 2d 1255, 1260 (Fla. 2003)); *see Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

Merck contends that the postconviction court erred by failing to rule that the following evidence constitutes *Brady* material: (1) the instruction to Thomas to "stick to" his deposition testimony; (2) a recollection Thomas had that Merck was slumped over and nonresponsive during the getaway, which Merck argues was inadvertently suppressed as a result of the instruction to "stick to" the deposition testimony; (3) the instruction that Thomas would be arrested if he failed to appear; and (4) Thomas's statement to the prosecutor before trial that he was having difficulty remembering how much Merck drank. For the reasons provided below, we disagree.

First, the instruction to "stick to" Thomas's deposition testimony does not constitute *Brady* material. As explained above, the postconviction court found that this instruction was nothing more than a direction to rely on prior testimony to refresh Thomas's recollection, and this finding is supported by competent, substantial evidence. Therefore, Merck has not established the first prong of *Brady*.

Second, as to Thomas's memory of Merck's slumping over and not responding to instructions to change clothes, the postconviction court found, and Thomas's testimony supports, that the prosecutor did not know about this recollection. Further, the postconviction court found, and Thomas's testimony supports, that Thomas never told the prosecutor about it and that he did not have this recollection until after his guilt-phase testimony. Although Merck emphasizes portions of Thomas's evidentiary-hearing testimony that would support a finding that he had this memory during his guilt-phase trial testimony, this emphasis is an improper attempt to have this Court reweigh the evidence. *See Porter*, 788 So. 2d at 923. The pertinent legal principle to apply to the facts found by the postconviction court on this matter is that "[a] *Brady* violation occurs 'when the government fails to disclose evidence materially favorable to the accused.' " *Hurst v. State*, 18 So. 3d 975, 988 (Fla. 2009) (quoting *Youngblood v. West Virginia*, 547 U.S. 867, 869-70 (2006)). Because neither the prosecutor nor any other

- 18 -

representative of the State knew about the slumping incident, the State cannot be said to have failed to disclose it. Therefore, Merck has not established the second prong of *Brady*.

Merck argues that the State did not have to know about this information to suppress it, as the *Brady* test for suppression includes inadvertent suppression, and one need not know about a fact to inadvertently suppress it. Assuming *arguendo* that this position could be valid under some circumstances, the evidence Merck presented at the postconviction hearing does not support such a theory of suppression. Merck's counsel attempted to elicit testimony from Thomas that the prosecutor's instruction caused him not to reveal the slumping incident at trial, but Thomas did not confirm this suggestion. This fact, along with the finding and evidence that Thomas did not have this recollection until after the guilt phase, shows that Merck failed to establish his theory of suppression as to this issue.

Third, as to the instruction that Thomas would be arrested if he failed to appear, the State correctly points out that Merck's postconviction counsel did not ask Merck's trial counsel if he knew about this threat. Part of establishing a *Brady* claim is showing that the defense did not possess the information at issue. *See Hurst v. State*, 18 So. 3d 975, 988 (Fla. 2009) (noting that the "defendant has the burden" to prove each element of a *Brady* claim); *Provenzano v. State*, 616 So. 2d 428, 430 (Fla. 1993) (explaining that "[t]here is no *Brady* violation . . . where the

- 19 -

defense . . . had the information"). Because Merck failed to show that his counsel was unaware of the threat to arrest Thomas if he failed to appear or even to ask his counsel about this matter at the evidentiary hearing, Merck failed to meet his burden to establish that this information was suppressed.

Fourth, as to Thomas's statement to the prosecutor that he was having difficulty remembering how much Merck drank, even if this fact was suppressed, it is not significant enough to meet the *Brady* standard of materiality. Thomas testified at the evidentiary hearing that, other than his perception of Merck's level of intoxication and memory of Merck's slumping, nothing that he currently remembers is different from what he previously testified to. At trial, Thomas described Merck's speech and motor skills as being unaffected by alcohol, stated that Merck bragged about the stabbing immediately afterwards and during the days that followed, and quoted statements of Merck indicating his specific intent to kill the victim, including Merck's explanation that he decided to kill the victim because the victim did not back down and Merck's statement that if the victim was not dead, he would go to the hospital to finish killing him. Furthermore, at the evidentiary hearing, Thomas testified again that "kind of what [he] recall[s]" is that he and Merck "were drinking pretty much the same amount," although Merck "may have had a little bit more than" Thomas. That testimony is consistent with Thomas's trial testimony. Also, Sullivan's observations that the attacker was

having no trouble walking or talking corroborated Thomas's testimony concerning the lack of observable effects of alcohol in Merck.

For these reasons, although questioning on this issue could have led the jury to discredit Thomas's testimony about the exact number of alcoholic beverages Merck drank, it would not have affected the more pertinent question of what observable effects the alcohol had on Merck and whether the evidence, on the whole, showed that Merck took the actions ascribed to him and did so with the requisite intent. Accordingly, the absence of questioning on this matter does not undermine our confidence in the verdict.

In addition, Merck argues that this evidence must be considered cumulatively with other evidence that he presented previously in postconviction proceedings and evaluated under the *Brady* standard of materiality. However, Merck has not identified any suppressed evidence that was the subject of a prior postconviction proceeding. Therefore, he has not identified any additional evidence to be evaluated under the *Brady* standard of materiality in the consideration of the motion at issue. *Cf. Smith v. Sec'y Dep't of Corr.*, 572 F.3d 1327, 1334 (11th Cir. 2009) ("Considering the undisclosed evidence cumulatively means adding up the force of it all and weighing it against the totality of the evidence that was introduced at the trial. That is the way a court decides if its confidence in the guilty verdict is undermined where a suppressed-evidence type of

*Brady* claim is involved, or if the suppression was harmless beyond a reasonable doubt where a *Giglio* type of *Brady* claim is involved.").

For the foregoing reasons, Merck's *Brady* claim lacks merit.

**Newly Discovered Evidence Claim**

Merck further argues that, to the extent the new information he received from Thomas does not establish a *Giglio* or *Brady* violation, it constitutes newly discovered evidence entitling him to a retrial. We disagree because this claim is both procedurally barred and without merit.

*Procedural Bar*

This claim is procedurally barred because it was not filed within one year of the date it became discoverable through due diligence. *Franqui v. State*, 118 So. 3d 807, 2013 WL 2211675, at *1 (Fla. 2013) (table decision); *Jimenez*, 997 So. 2d at 1064 (citing *Mills*, 684 So. 2d at 804-05). This claim is based on testimony received from a witness who has been known since before trial and who was not sought by postconviction counsel until 2014, ten years after he testified in the last resentencing proceeding in this case. Significantly, the decision to contact Thomas was not based on any new information, but rather, a decision by Merck's current counsel that contacting Thomas might be fruitful.

Although Merck may not have been able to discover all the evidence at issue in this claim at the time of trial (particularly that concerning the slumping incident,

which Thomas did not remember until after the guilt-phase trial), he could have discovered it at least between the time of the last resentencing and 2014. Because the efforts Merck's current counsel made to contact Thomas could have been made at any time between the time of the last resentencing and 2014, and there is no indication in the record that Thomas would have been less forthcoming if he had been contacted before 2014, a claim based on information discovered from Thomas as a result of the 2014 effort is untimely.

*Merits*

In any event, this claim also fails on the merits. A newly discovered evidence claim consists of two requirements. First, the evidence "must have been unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that the defendant or his counsel could not have known [of it] by the use of diligence." *Jones v. State*, 709 So. 2d 512, 521 (Fla. 1998) (quoting *Torres-Arboledar v. Dugger*, 636 So. 2d 1321, 1324-29 (Fla. 1994)). Second, it "must be of such a nature that it would probably produce an acquittal on retrial." *Id*. This analysis requires consideration of all newly discovered evidence that would be admissible at a new trial, including evidence presented in other postconviction claims, and an evaluation of the weight of that evidence along with all the evidence that was already admitted at trial. *Id*. at 521-22.

For the purpose of our analysis, we have broken Merck's claim down into six items of evidence and categorized the items according to whether they concern alleged inaccuracies in Thomas's testimony or a bias or motive for Thomas to testify falsely. We discuss the two groups of items in turn and then address certain evidence from earlier postconviction proceedings on which Merck relies, ultimately concluding that the combined effect of the evidence that could be presented in a new trial would not satisfy the requirements of the newly discovered evidence test.

The evidence related to the accuracy of Thomas's trial testimony consists of the following: (1) that the game of pool was several hours after the crime; (2) Thomas's recollection that Merck was slumped over and unresponsive in the car immediately after the stabbing; and (3) Thomas's current testimony that Merck was more intoxicated than he indicated at trial and, in fact, was "highly intoxicated" or "very, very drunk," was a "lightweight" when it came to drinking alcohol, and may have had more alcohol than Thomas.

The timing of the game of pool is not newly discovered evidence: the pool game was discussed at trial, and Thomas could have been cross-examined about the specific timing then. Therefore, the information Merck relies on now could have been discovered at the time of trial with the exercise of due diligence and cannot support a new claim. *See id.* at 521.

The remaining items in this category concern information that Thomas has said he remembered after the guilt phase or felt he did not properly convey at trial. However, Thomas's postconviction testimony concerning these points was equivocal, and to the extent it is inconsistent with his trial testimony, it is not so materially inconsistent as to create a reasonable probability of an acquittal of first-degree murder on retrial. *See id.* (stating the newly discovered evidence test).

When considered together with the remainder of the testimony that Thomas has given throughout this case, which Thomas maintains is true, the incident of Merck's slumping and failing to respond is not as significant as Merck contends it is. Thomas gave three sworn accounts of the incident up to and including the guilt-phase trial, and he never remembered that detail or found it significant enough to reveal, even though he was asked at the end of his pre-trial statements if there was anything else he thought he should mention. When the slumping incident is considered in this context and in light of Thomas's postconviction testimony that he was never intentionally misleading, as well as the postconviction court's finding that Thomas did not testify falsely, it becomes clear that this detail must have been a momentary occurrence, not a significant event reflecting Merck's state of mind during the stabbing.

The other inconsistency concerns Thomas's characterization of Merck's level of intoxication and an acknowledgment that Merck may have had "a little bit

more" to drink than Thomas said at trial. However, Thomas did not testify at the postconviction hearing that his testimony concerning the number of drinks Merck consumed was incorrect, and his subjective impression of Merck's level of intoxication is overcome by other, more concrete testimony that he gave, both at trial and during the evidentiary hearing.

Specifically, Thomas confirmed at the evidentiary hearing that, just as he indicated at trial, Merck could not stop talking about the murder after he committed it and was "rather proud of it." He also confirmed that Merck held the bloody knife up and said that if Newton was not dead, he would go to the hospital to finish killing him, and that Merck even compared stabbing the victim to a sexual experience. When asked if he had "changed [his] mind about whether [Merck] would have known what he was doing and remembered what he was doing," Thomas answered, "No. Nothing else is different."

Given that Thomas testified that "[n]othing else is different," his postconviction testimony indicates that Thomas testified accurately about Merck's recounting of the event not only on the night of the stabbing but in the days that followed, showing that Merck remembered it. It also indicates that Merck explained that he made a conscious decision to kill Newton when Newton did not show submission as Merck was advancing toward him. Furthermore, Thomas's testimony at trial concerning Merck's identity as the stabber and his intent to kill

were corroborated by other evidence. Not only did Sullivan identify Merck as the attacker, but she also testified that she heard Merck say he was going to teach Newton how to bleed, and another witness heard a similar statement. Additionally, one of the three females who spent time with Merck and Thomas in the weekend after the stabbing testified that Merck recounted the stabbing without prompting from Thomas and took responsibility for it. In consideration of this evidence, we conclude that the slumping incident and Thomas's subjective impression that Merck may have been more intoxicated than Thomas conveyed at trial would not probably produce an acquittal if Merck were to have a new guilt-phase trial.

The remaining items of allegedly newly discovered evidence, those relating to Thomas's alleged bias or motive to testify falsely, are the following: (1) Thomas's acknowledgement that he may have told Merck's postconviction investigator that he was instructed to minimize Merck's level of intoxication; (2) that Thomas was instructed to "stick to" his deposition testimony; and (3) that Thomas was told he would be arrested and held until he testified if he did not appear for Merck's trial. These items do not combine with the previously discussed items to show that Merck would probably be acquitted on a retrial. *See Jones*, 709 So. 2d at 521 (setting forth the newly discovered evidence test). Although Thomas acknowledged that he "may have" said that the prosecutor told him to minimize Merck's level of intoxication, he explained that he was referring

to the instruction to "stick to" his deposition testimony, which the postconviction court found was merely an instruction to use that testimony to refresh his memory. Additionally, as indicated in our analysis of Merck's *Giglio* claim, the threat of arrest amounted to a showing that Thomas was compelled to testify at the trial, not that he was required to testify to a particular set of facts. Therefore, this evidence would not have impeached Thomas significantly.

The impeachment value that Merck might gain from the use of this information in a hypothetical new trial would be overcome by the rehabilitation that would follow. Each of Merck's points concerning Thomas's bias or motive to testify falsely relates to circumstances that arose after Thomas gave his original sworn statement to the police. Therefore, that statement, which was consistent with Thomas's trial testimony, would be used to rehabilitate Thomas in a new trial if Merck's counsel relied on any of the information he recently obtained concerning Thomas's alleged bias and motive to testify falsely. *See Chandler v. State*, 702 So. 2d 186, 197-98 (Fla. 1997) (explaining that prior consistent statements are admissible as substantive evidence if "the person who made the prior consistent statement testifies at trial and is subject to cross-examination concerning that statement; and the statement is offered to 'rebut an express or implied charge of . . . improper influence, motive, or recent fabrication' ") (quoting *Rodriguez v. State*, 609 So. 2d 493, 500 (Fla. 1992)); § 90.801(2)(b), Fla. Stat.

(2018). Thomas's sworn statement to the police would have the effect not only of rehabilitating him but of bolstering his trial testimony. *See Rodriguez*, 609 So. 2d at 500. Given Thomas's recent testimony confirming the most significant aspects of his trial testimony—and, therefore, showing that he would again confirm them at trial in response to any questions concerning pressure from the State—and the manner in which his prior statement to the police could be used in response to such impeachment, the newly obtained information concerning alleged improper influence by the State does not combine with the remaining items of allegedly newly discovered evidence to establish that Merck would probably be acquitted on retrial. *See Jones*, 709 So. 2d at 521 (stating the newly discovered evidence test).

Finally, Merck requests that, in analyzing the merits of this claim, this Court consider not only the allegedly newly discovered evidence raised in the successive postconviction motion at issue, but also the prior postconviction testimony of Dr. John Brigham, which related to factors that have been shown generally to render eyewitness identification inaccurate or less reliable, as well as specific factors that might have called the reliability of Sullivan's identification of Merck into question. *See Swafford v. State*, 125 So. 3d 760, 775-76 (Fla. 2013). We conclude that the addition of Dr. Brigham's testimony to the trial evidence and the allegedly newly discovered evidence would not probably produce an acquittal on retrial.

For the foregoing reasons, Merck's claim of newly discovered evidence is without merit.

**CONCLUSION**

Because Merck has failed to show error in the denial of his successive postconviction motion alleging *Giglio* and *Brady* violations, as well as a claim of newly discovered evidence, we affirm the order denying that motion.

It is so ordered.

CANADY, C.J., and PARIENTE, LEWIS, QUINCE, POLSTON, LABARGA, and LAWSON, JJ., concur.

NO MOTION FOR REHEARING WILL BE ALLOWED.

An Appeal from the Circuit Court in and for Pinellas County,
 Cynthia J. Newton, Judge - Case No. 521991CF016659XXXXNO

Linda McDermott of McClain & McDermott, P.A., Estero, Florida,

 for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, and Stephen D. Ake, Senior Assistant Attorney General, Tampa, Florida,

 for Appellee